205 F.3d 731 (4th Cir. 2000)
 PHILLIP A. CHISHOLM, Plaintiff-Appellant,
v.
UHP PROJECTS, INCORPORATED, Defendant & Third Party Plaintiff-Appellee,
v.
SEALIFT, INCORPORATED; ULTRA MARITIME, INCORPORATED; WILCO SUPPLY, INCORPORATED; SPIR STAR, INCORPORATED; KUTTING, INCORPORATED; SPIR STAR DRUCKSCHLAUCHE GMBH, Third Party Defendants.
 No. 99-1018 (CA-96-578-2).
 UNITED STATES COURT OF APPEALS, FOR THE FOURTH CIRCUIT.
 Argued: November 30, 1999.
Decided: March 8, 2000.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.
 Robert G. Doumar, Senior District Judge.
 COUNSEL ARGUED: David Joel Berg, LATTI ASSOCIATES, L.L.P., Boston, Massachusetts, for Appellant. Temple Witt Cabell, SCHAFFER & CABELL, P.C., Richmond, Virginia, for Appellee. ON BRIEF: David H. Sump, CRENSHAW, WARE & MARTIN, Norfolk, Virginia, for Appellant.
 Before WILKINSON, Chief Judge, KING, Circuit Judge, and Cynthia Holcomb HALL, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.
 Affirmed by published opinion. Senior Judge Hall wrote the majority opinion, in which Chief Judge Wilkinson joined. Judge King wrote a dissenting opinion.
 OPINION
 CYNTHIA HOLCOMB HALL, Senior Circuit Judge:
 
 
 1
 Philip Chisholm ("Chisholm") appeals the district court's order setting aside damages in the amount of $90,000 awarded against UHP Projects ("UHP") for breach of the warranty of workmanlike performance. We have jurisdiction pursuant to 28 U.S.C.§ 1291, and we affirm.
 
 I.
 
 2
 UHP is a company that cleans tanks and holds for ocean vessels with ultra high pressure water jets. Sealift, Inc. ("Sealift") owned the ship S.S.ULTRAMAX which on July 1, 1994, was moored at Cargill South Terminal in Chesapeake, Virginia. On this particular day, Sealift had contracted with UHP to remove dust and scale from the ULTRAMAX's ballast tanks. The pump and hoses used to operate the ballast tank were owned by UHP. Chisholm was aboard the ULTRAMAX as a first assistant engineer.
 
 
 3
 Early that morning, as UHP employees were preparing to begin cleaning one of the ballast tanks, Patrick Courville, a UHP supervisor, noticed a leak in a connector between the two end fittings of the ultra high pressure hoses. He readjusted the connector to stop the leak and then directed another UHP employee to begin the blast. Within a few seconds of the jet reaching full power, the hose and/or a fitting failed causing the hose to blow apart from the end-fitting. The loose hose veered and struck Chisholm who was standing approximately 10 to 15 feet away from the ballast tank. Chisholm suffered a compound depressed skull fracture and a lacerated dura. Chisholm fully recovered from this serious injury and returned to work approximately 8 or 9 months later.
 
 
 4
 Chisholm presented a claim against the ship for maintenance and cure benefits, and for unseaworthiness, to which Sealift responded by tendering $29,025.93 for the maintenance and cure benefits. Sealift demanded that UHP participate in settlement negotiations with Chisholm and pay around $200,000 in indemnity. UHP refused Sealift's demand so Sealift filed suit against UHP in federal district court alleging causes of action arising under implied contractual indemnity and tort indemnity. Prior to summary judgment, UHP accepted that it had a duty to indemnify Sealift in accord with the admiralty warranty of workmanlike performance and agreed to tender Sealift the amount which Sealift settled with Chisholm. This amount was $200,000 plus the $29,025.93 in maintenance and cure benefits, a total payment by Sealift to Chisholm of $229,025.03. This exact amount was then tendered by UHP to Sealift as indemnity on or about December 11, 1996.
 
 
 5
 Meanwhile, on June 5, 1996, Chisholm filed a complaint against UHP pleading causes of action for negligence and an admiralty law claim for breach of the implied warranty of workmanlike performance. On cross-motions for summary judgment, the district court granted summary judgment for UHP on the negligence claim which left the admiralty claim as the sole surviving cause of action. See Chisholm v. UHP Projects, Inc., 30 F. Supp. 2d 928, 929 (E.D.Va. 1998). As a result, the district court concluded that Chisholm did not have a right to a jury trial but impaneled a jury anyway to function as an advisory body.[1] See id. at 929-30. The admiralty claim proceeded to a two day trial in which the jury found liability and imposed $90,000 of damages against UHP. See id. at 930. The district court adopted the jury's verdict as its own and after post-trial briefing held that the prior settlement between Chisholm and Sealift, which exceeded the jury's award, operated to negate the award against UHP. See id. at 938-39. Consequently, the district court ordered this case dismissed on the merits and judgment entered in favor of UHP. See id. at 939. Chisholm appeals this ruling.
 
 II.
 
 6
 Because this appeal is purely on a question of law, the standard of review is de novo. See United States v. Han, 74 F.3d 537, 540 (4th Cir. 1996). Chisholm's claim against Sealift arose under the doctrine of seaworthiness while his claim against UHP arose under the cause of action for breach of the implied warranty of workmanlike performance. The doctrine of seaworthiness arises by operation of law and states that a ship owner owes the seaman an absolute, non-delegable duty to provide a seaworthy vessel. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549-50 (1960) (seaworthiness is defined as a vessel that has a hull and equipment that are reasonably adequate in design and maintenance, and a crew that is of sufficient character to perform its intended function in the operation of the vessel). Liability for violation of the doctrine of seaworthiness is without fault. See id.
 
 
 7
 The implied warranty of workmanlike performance ensures that the stevedore will warrant the quality of his services while onboard the vessel. See Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 132-33 (1956) (overruled by Congress on different grounds, see Ducrepont v. Baton Rouge Marine Enterprises, Inc., 666 F. Supp. 882, 884-85 (1987) (stating that the congressional enactments sought to overrule only the damages aspect of the Ryan holding)). The warranty arises under operation of contract but extends to all foreseeable parties, including the employees of the shipowner. See Sanderlin v. Old Dominion Stevedoring Corp., 385 F.2d 79, 81-82 (4th Cir. 1967). Liability for the breach of the warranty of workmanlike performance arises without fault and appears to approach strict liability. See Salter Marine, Inc. v. Conti Carriers and Terminals, Inc., 677 F.2d 388, 390 (4th Cir. 1982).
 
 
 8
 The issue of whether, under admiralty law, a nonsettling defendant is entitled to an offset of damages it owes because of the prior settlement between the plaintiff and a third party has been recently addressed by the Supreme Court. See McDermott, Inc. v. AmClyde, 511 U.S. 202 (1994). McDermott involved several joint tortfeasors who were found to be proportionately negligent in causing damage to a crane and oil and gas production platform owned by plaintiff. See id. at 204. Plaintiff settled with three out of the five defendants for $1 million and proceeded to trial against the remaining two nonsettling defendants. See id. A jury assessed plaintiff's damages in the amount of $2.1 million and allocated fault in the proportionate amounts of 32% and 38% respectively to the remaining defendants. See id. The question presented to the Supreme Court was whether the damages should be calculated with reference to the jury's allocation of proportionate responsibility, "or by giving the nonsettling defendants a credit for the dollar amount of the settlement." Id. The Supreme Court opted for the proportionate approach.
 
 
 9
 The Supreme Court first stated that fashioning such remedies in the ambit of admiralty law was not unusual because traditionally the judiciary has taken the lead in such matters. See id. at 207 (citing United States v. Reliable Transfer Co., Inc., 421 U.S. 397 (1975)). The Supreme Court's analysis began from the premise that"when a plaintiff settles with one of several joint tortfeasors, the nonsettling defendants are entitled to a credit for that settlement." Id. at 208. In choosing the proportionate approach, the Supreme Court balanced three policy considerations: consistency with its precedent that dictated a proportionate fault approach in terms of joint tortfeasor's liability, promotion of settlement, and judicial economy. See id. at 211.
 
 
 10
 With respect to the promotion of settlement and judicial economy criteria, the Supreme Court concluded that both the proportionate fault and dollar-for-dollar offset approaches produced the same results. See id. at 214-217. Hence, the clinching factor was compliance with its precedent that dictated a proportionate fault approach in terms of joint tortfeasor's liability. The Supreme Court stated that the dollar-for-dollar approach would produce frequent deviations from the equitable apportionment of damages, see id. at 212-13, and consequently adopted the proportionate rule on fairness grounds. See id. at 217.
 
 
 11
 In so doing, the Supreme Court explicitly rejected the "one satisfaction rule." The "one satisfaction rule" operates to "reduce a plaintiff's recovery against a nonsettling defendant in order to ensure that the plaintiff does not secure more than necessary to compensate him for his loss." Id. at 218. The Supreme Court first noted that the "one satisfaction rule" only comes into play in those instances where the plaintiff would be overcompensated (a fact not present in McDermott). See id. at 218-19. Regardless of that factual scenario, the Supreme Court then added that it would still apply the proportionate approach even if it would result in overcompensation because "[t]he law contains no rigid rule against overcompensation." Id. at 219. It stated that this was a policy consideration that valued imposing payments on tortfeasors who cause damage more than avoiding overcompensating plaintiffs. See id. The Supreme Court recognized that settlements "frequently result in the plaintiff's getting more than he would have been entitled to at trial" but refused to penalize such plaintiff by opining that "a plaintiff's good fortune in striking a favorable bargain with one defendant gives other defendants no claim to pay less than their proportionate share of the total loss." Id. at 219-20.
 
 
 12
 Even though both parties and the district court below recognize that Sealift and UHP are not joint tortfeasors because their duties towards Chisholm arose from independent sources, the parties still urge us to look to McDermott in resolving this case. Similarly, the dissent would refer to McDermott "for guidance." Such reliance is inapposite for one overriding reason. As illustrated above, even though the Supreme Court considered three factors in deciding whether to adopt the proportionate approach versus the dollar-for-dollar approach, the only dispositive factor was based on the equitable considerations on the apportionment of degrees of fault. See id. at 212-14; see also Gravatt v. City of New York, 73 F.Supp. 2d 438, 440 (S.D.N.Y. Nov. 5, 1999) (stating that the promotion of settlement and judicial economy factors were a wash as between the proportionate share and dollar-for-dollar approaches). In this case, both Sealift and UHP owed Chisholm duties which impose liability without fault. Consequently, there can be no allocation of proportion of fault as a matter of fact and law.
 
 
 13
 Precedent since McDermott offers little guidance on the issue at hand when the settling and nonsettling defendants are not joint tortfeasors. Boykin v. China Steel Corp., 73 F.3d 539 (4th Cir. 1996), an admiralty case relied on heavily by Chisholm, is not particularly instructive. In Boykin, the plaintiff's decedent was killed as the result of the negligence of the nonsettling defendants. See Boykin, 73 F.3d at 541. After the settlement between the settling defendant and the plaintiff, the settling defendant filed a lawsuit seeking indemnity from the nonsettling defendants. The settling defendant, a ship owner, was found to be "zero percent at fault" at trial but was nevertheless found liable by virtue of the no-fault doctrine of seaworthiness. See id. at 544. The settling defendant was therefore not a joint tortfeasor for two distinct reasons: (1) he had 0% of fault in the negligence action; and (2) his liability was premised on a no-fault doctrine. See id. at 544 n.4. Because the settling defendant was not a joint tortfeasor, McDermott was deemed inapplicable and the settling defendant was entitled to full indemnity from the nonsettling defendants. See id. at 544-45.
 
 
 14
 The only element truly instructive about Boykin is the statement that the McDermott proportionate allocation scheme would be inapplicable in cases not involving joint tortfeasors. Otherwise, the rest of the case is so factually different from the one at hand that no general rule can be articulated. The two key differences that render Boykin inapposite are: (1) at least some of the defendants, be it settling or nonsettling, were deemed to be at fault; and, (2) the case involved an indemnity claim between defendants. Boykin therefore stands for the proposition that a settling defendant without fault can secure full indemnity from other defendants at fault regardless of the those other defendants' degree of culpability. See also Bertram v. Freeport McMoran, Inc., 35 F.3d 1008, 1013 (5th Cir. 1994).
 
 
 15
 Westinghouse Credit Corp. v. M/V New Orleans, 39 F.3d 553 (5th Cir. 1994), similarly states that McDermott"applies only to cases in which there has been a settlement by a joint tortfeasor." Id. at 555. In Westinghouse, two nonsettling defendants were seeking to offset the damages award against them with the award received by the plaintiff from a settling defendant. In ruling that damages had been incurred in two separate and independent instances, the court stated that "[b]ecause the essential relationship of joint tortfeasors does not exist between [the nonsettling defendant] on the one hand and the settling defendants on the other, [the nonsettling defendant] is not entitled to any settlement credit." Id. at 555-56.
 
 
 16
 Chisholm has seized on the seemingly sweeping nature of this last sentence to state that the only circumstance in which credit is due to nonsettling defendants following a prior settlement is that scenario in which there is a joint tortfeasor relationship between all defendants involved. This reads Westinghouse out of context. The above sentence is found immediately following the passage below:
 
 
 17
 The photos taken by Webster in November 1985 and September 1986, along with his reports and the corroborating testimony, confirm that what we have here is two separate torts resulting in two different harms -one occurring over a period of two days as a result of a negligent towage of the vessel and one occurring over a subsequent period of one year as a result of negligence in the care and custody of the vessel during storage.
 
 
 18
 Id. Thus, when using the term "joint tortfeasor" following the above passage, the Westinghouse court was referring to the two independent sources of the damage suffered by the plaintiff and not to a definition of the term "joint tortfeasor" that limits the term's application to situations in which two defendants are liable to a plaintiff under the same cause of action. I.e.the Westinghouse court focused on the harm suffered by the plaintiff and declared that the defendants in Westinghouse were not "joint tortfeasors" because the damage that they caused the plaintiff could be traced to two separate and independent events. Westinghouse, therefore, stands for the proposition that a nonsettling defendant cannot receive credit from a prior settling defendant when the defendants each independently caused the plaintiff's divisible injury.
 
 
 19
 The dissent would begin the analysis in this case by applying the "collateral source rule." The "collateral source rule" prevents the defendant from claiming an offset from compensation already received by the plaintiff from a different source when this source is collateral to the defendant. See United States v. Price, 288 F.2d 448, 449 (4th Cir. 1961). The two policies underlying this rule are "(1) to punish the tortfeasor, or (2) to ensure that the injured party receives benefits for which he or she has contracted." Clausen v. Sea-3, Inc., 21 F.3d 1181, 1193 n.18 (1st Cir. 1994). Because UHP is liable under a strict liability doctrine, and consequently liable without fault, UHP does not fall within the scope of the first policy rationale. The dissent sees the jury verdict finding UHP liable for breach of the warranty of workmanlike performance as a vindication of its assertion that "UHP's liability before the jury depended upon a demonstration of fault." Nothing in the record can be construed to support this assertion. The district court dispensed with Chisholm's demand for a jury because no negligence claim, i.e.no fault-based claim, remained in the case. Likewise, the doctrine of workmanlike performance is not premised on any showing of fault. The second policy rationale is inapplicable because Chisholm is not claiming benefits for which he contracted. Therefore, neither of these policies are at play here and reliance on the "collateral source rule" in this case is inapposite.
 
 
 20
 The "one satisfaction rule" offers us the best starting point for resolving the issue at hand. Even though this rule is traditionally employed in cases involving joint tortfeasors, its equitable considerations operate equally well in the strict liability arena. As noted, this equitable doctrine operates to reduce a plaintiff's recovery from the nonsettling defendant to prevent the plaintiff from recovering twice from the same assessment of liability. See Krieser v. Hobbs, 166 F.3d 736, 743 (5th Cir. 1999); see also Marcus, Stowell & Beye Government Securities, Inc. v. Jefferson Investment Corp. , 797 F.2d 227, 233 (5th Cir. 1986) ("[t]he one satisfaction rule is based on the notion that allowing a double recovery is ordinarily against legal policy"); Restatement (Second) of Torts § 885(3) (1979). The essential requirement for the "one satisfaction rule" is that the amounts recovered by settlement and the judgment must represent common damages arising from a single, indivisible harm.[2]See Howard v. General Cable Corp., 674 F.2d 351, 358 (5th Cir. 1982); see also Harris v. Union Elec. Co., 846 F.2d 482, 485 (8th Cir. 1988) (characterizing the "one judgment rule" as entitling the plaintiff to one satisfaction for each injury).
 
 
 21
 The above inquiry into the origin of the harm could yield two possible answers: (1) the harm is separate and clearly delineated for each defendant; or (2) the harm is single and indivisible. If the factual inquiry yields the former answer, then the analysis terminates because the nonsettling defendant cannot claim credit for a settlement on a cause of action in which he took no part. See Westinghouse, 39 F.3d at 555-56. However, if the defendants caused a single and indivisible harm then the analysis must proceed to a determination of whether the plaintiff has been overcompensated.
 
 
 22
 The determination into whether or not the plaintiff has been overcompensated will necessarily begin with the presentation of two sets of figures: (1) the amount received from the settling defendant; and (2) the amount awarded after trial against the nonsettling defendant. If the former amount is larger than the latter amount, then the plaintiff has been overcompensated in the settlement. If the latter amount is larger than the former amount, then the plaintiff has been undercompensated in the settlement. No apportionment of culpability between the defendants is possible because the whole premise of this scenario is that both defendants, settling and nonsettling, are liable for a nofault, single, indivisible harm and therefore the amount imposed at trial against the nonsettling defendant will necessarily be the full amount of damages.
 
 
 23
 In cases where the trial award results in an overcompensation in the settlement to the plaintiff, the district court should negate the jury award. See Singer v. Olympia Brewing Co., 878 F.2d 596, 600-01 (2d Cir. 1989) (stating that a court will not help a plaintiff achieve a total recovery that exceeds the amount received in the litigated case and that the reduction will be assessed against the court judgment). However, in those cases where the trial's verdict fixing the total harm to the plaintiff indicates an undercompensation in the settlement, the amount should be reduced, but only to the extent that the plaintiff still comes away with the full recovery as deemed by the fact-finder. See Strachan Shipping Co. v. Nash, 782 F.2d 513, 520 (5th Cir. 1986).
 
 
 24
 The following two examples illustrate the above concept: In an action where both defendants breach no-fault duties, plaintiff settles with defendant 1 for $200,000. Defendant 2 proceeds to trial, loses and has $100,000 of damages awarded against him. The $100,000 award is offset resulting in a judgment for the defendant. Plaintiff still receives $100,000 more than the total amount of damages as determined by the fact-finder but does not further benefit from a second windfall. The dissent seems to ignore the fact that plaintiff has already benefitted from a $100,000 windfall and it is a second windfall that the application of the "one satisfaction rule" is designed to prevent in this circumstance.
 
 
 25
 The second example occurs in an action where two defendants both breach no-fault duties and defendant 1 settles with plaintiff for $100,000. Defendant 2 proceeds to trial, loses and has a $500,000 award assessed against him. This time the trial award is reduced by the $100,000 amount that plaintiff received through his settlement with defendant 1, thus resulting in a net award of $400,000 against defendant 2. The "one satisfaction rule" now operates to level plaintiff's recovery to the full amount of his damages.
 
 
 26
 Because the no-fault breaches apply to both defendants, the focus in the above examples is not on whether one defendant pays more than the others or whether a particular defendant receives a windfall. Rather, the focus is exclusively on the amount the plaintiff is entitled to receive.[3] The dissent, in applying the collateral source rule, states that the majority is giving UHP an incentive not to settle the first suit which Chisholm brought against Sealift. That is, the dissent seems to premise its reasoning on the assumption that a prior settlement will always be larger than a subsequent damages award at trial. It is hard to see why this is so. If the jury had assessed a $1,000,000 damages award in Chisholm's favor in the second suit (i.e. the suit brought by Chisholm against UHP), under the "one satisfaction rule" UHP would have been saddled with another payment of approximately $800,000.Now UHP's incentive to settle the first suit is readily apparent because a prior settlement in which UHP was a participant would have precluded Chisholm's second suit. Thus, each defendant and plaintiff will, on a case-by-case basis, assess the advantages and risks of settling versus going to trial. The test formulated above does not alter the traditional risk-weighing that parties continuously have to make in developing litigation strategy. It provides a structure that contains trial damage awards in cases where both defendants breach a no-fault duty towards the same plaintiff.
 
 
 27
 The following three-part test summarizes the considerations that courts must make in situations where a plaintiff receives an award of damages in cases where there are multiple defendants, some of whom have settled with the plaintiff prior to the trial proceedings: (1) Are the settling and nonsettling defendants both solely liable for breaches of no-fault duties? (2) Did both defendants' breaches result in a single indivisible harm to the plaintiff? (3) Did the jury award result in the prior settlement being an overcompensation or an undercompensation? If the first two questions are answered in the affirmative, the inquiry proceeds to the final question. If the first question is answered in the negative, then the inquiry might shift either to a McDermott scenario where both defendants breach fault-based duties or to a Boykin-type situation where only one defendant is culpable. If the second question is answered in the negative, then the nonsettling defendant is not entitled to a credit from the prior settlement. See Westinghouse, 39 F.3d at 555-56.
 
 III.
 
 28
 Applying the three-part test to the facts of this case it appears that both Sealift and UHP solely breached no-fault duties: Sealift was liable under the doctrine of seaworthiness while UHP breached the implied warranty of workmanlike performance. Neither of these parties are liable for any fault-based breaches. The harm to Chisholm was single and indivisible being the injury he sustained from being struck by the wild hose. Chisholm received approximately $230,000 from Sealift and was awarded $90,000 by the trial court against UHP. Hence, the settlement was an overcompensation. Therefore, the $90,000 is reduced to zero as an offset to the amount received by Chisholm in the prior settlement.
 
 
 29
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The fact that the district court ruled that Chisholm did not have a right to a jury because he presented no viable negligence claim rebuts the dissent's assertion that UHP's liability was "not without fault." The dissent goes to great lengths to breath a negligence cause of action into Chisholm's claim against UHP for breach of the warranty of workmanlike performance. However, if negligence were a part of this claim, then Chisholm would have had a right to a jury.
 
 
 [2]
 Chisholm argues that the terms"common damages" and "single, indivisible harm" are terms of art that apply exclusively to joint tortfeasors. This argument is not borne out by the relevant caselaw. Courts use these terms in their plain meaning to refer to the same injury caused by different parties. See e.g. Howard, 674 F.2d at 358; Ratner v. Sioux Natural Gas Corp., 719 F.2d 801, 803 (5th Cir. 1983).
 
 
 [3]
 The district court, in its opinion, implied that it was using the "one judgment rule" to prevent UHP from being unduly penalized in light of the fact that it had already indemnified Sealift for over double the amount the jury said UHP was liable for. See Chisholm, 30 F. Supp. 2d at 937-38. From the opposite angle, the dissent also asserts that we should be wary of giving UHP a windfall. Even though we do not believe that UHP is getting a windfall, for the purposes of the "one satisfaction rule," the amounts that each defendant will have to pay are immaterial because the "one judgment rule" concerns itself with preventing overcompensation to the plaintiff regardless of the source of that overcompensation.
 
 
 KING, Circuit Judge, dissenting:
 
 30
 On July 1, 1994, Ultra High Pressure Projects, Incorporated ("UHP"), breached its duty to provide workmanlike performance on board the ULTRAMAX, and this breach was the proximate cause of Mr. Chisholm's severe injuries. As such, UHP is, under any modern definition of the term, a "tortfeasor." Because well-established legal principles do not permit such tortfeasors to offset tort damage awards with payments the plaintiff receives from a collateral source, UHP should be required to pay, in its entirety, the tort award fixed against UHP at trial. Therefore, I would reverse the district court's "equitable" offset that permitted UHP to avoid paying the $90,000 damage award.
 
 
 31
 The majority, by contrast, has fashioned, from whole cloth, a landmark "equitable" rule that benefits, ironically, a defendant (UHP) with none of the equities on its side. This new remedy not only affords UHP an offset it does not deserve; it also undermines core values -including the promotion of settlements and judicial economy and efficiency -encompassed in the law of admiralty. In fact, our existing scheme of admiralty remedies accounts for each of the equitable concerns that have driven the majority to create, without supporting authority, this new rule. In the end, the majority confirms that for every problem, there is one solution that is simple, neat and wrong. The majority has reached such a result in this case, and I therefore dissent.
 
 I.
 A.
 
 32
 When the "ultra high pressure" hose fitting struck Mr. Chisholm while he was at work on board the ULTRAMAX, he suffered a compound depressed skull fracture with lacerated dura.[1] This fractured skull required three days of in-patient hospitalization, after which Mr. Chisholm spent three months recuperating at his home with no physical activity. In September 1994, over three months after the accident, Mr. Chisholm undertook his first post-accident physical activity, and he could not attempt a return to work until January 1995. Even then, a physician hired by Sealift (Mr. Chisholm's employer and the owner of the ULTRAMAX) opined that Mr. Chisholm could not return to work until March 1995; as a result, Mr. Chisholm did not resume his duties as a seagoing engineer for nearly seven months after his injury.
 
 B.
 
 33
 Having incurred burdensome expenses and losing seven months of income as a result of his fractured skull, Mr. Chisholm requested compensation from Sealift for: (1) maintenance and cure benefits[2] and (2) damages as a result of the unseaworthiness of the ULTRAMAX.[3] Sealift responded by paying Mr. Chisholm $29,025.93 in maintenance and cure benefits. However, Sealift reserved the unseaworthiness claim until it could provide UHP the opportunity to participate in the settlement of that claim.
 
 
 34
 Sealift thereafter repeatedly sought to involve UHP in settlement negotiations in a continuing effort to avoid litigation. First, on April 18, 1996, Sealift requested that UHP: (1) take-over the defense of Mr. Chisholm's claim; (2) indemnify and hold Sealift harmless; and (3) approve a proposed settlement. UHP did not accept any of these requests; thus, on May 10, 1996, Sealift repeated these three requests, specifying that Mr. Chisholm and Sealift had agreed in principle upon a proposed settlement of $200,000 and that there was a May 24, 1996 deadline for UHP's participation in negotiations. Again, no UHP acceptance was forthcoming. Finally, on June 5, 1996, Sealift made a third (and final) attempt to include UHP in the settlement discussions. In its June 5, 1996 request, Sealift noted that there was a June 7, 1996 deadline for UHP's participation in the settlement negotiations. Again, UHP refused to join the negotiations.
 
 
 35
 On June 11, 1996, Sealift -having tendered its defense and having requested UHP's participation in the settlement negotiations three separate times to no avail -entered into a settlement agreement with Mr. Chisholm. Pursuant to that settlement, Sealift received a general release and Mr. Chisholm received $200,000. Because UHP refused to participate in the settlement negotiations, the settlement did not release UHP, and Mr. Chisholm specifically retained the option of seeking compensation from UHP separately.
 
 C.
 
 36
 On July 17, 1996, Sealift filed suit in the Eastern District of Virginia against UHP for indemnity on theories of: (1) breach of the implied warranty of workmanlike performance; and (2) negligence, seeking the settlement amount Sealift had paid to Mr. Chisholm. The indemnity suit proceeded to the summary judgment stage, and on December 11, 1996, before the court heard oral argument on Sealift's motion for summary judgment, UHP and Sealift entered into a settlement whereby UHP paid Sealift $229,025.93 to settle the indemnity claim. This settlement represented 100% of the payments Sealift had made to Mr. Chisholm arising out of his fractured skull and lacerated dura.
 
 D.
 
 37
 On June 5, 1996, before Mr. Chisholm settled with Sealift, he filed suit in the Eastern District of Virginia against UHP on: (1) a claim of common law negligence[4] and (2) an admiralty claim of breach of implied warranty of workmanlike performance. The case proceeded to trial, where the district court empaneled an advisory jury. That jury determined that Mr. Chisholm suffered $90,000 in damages as a result of UHP's breach of the implied warranty of workmanlike performance,[5] and after determining that Mr. Chisholm was not entitled to a jury trial, the district court adopted the jury's damage determination as its own. However, rather than entering judgment for Mr. Chisholm on the damage award, the district court entered judgment on behalf of UHP, holding that the "single recovery rule," when coupled with the "proportionate share rule," negated the award of damages. The result was that Mr. Chisholm received nothing from UHP, the sole tortfeasor here.
 
 II.
 A.
 
 38
 Courts have long recognized that allowing the tortfeasor a credit for payments from a collateral source detracts from the function of deterrence in tort law and that the defendant deserves to pay for his fault. See, e.g., Clausen v. Sea-3, Inc., 21 F.3d 1181, 1192-93 & n.18 (1st Cir. 1994); 22 Am. Jur. 2d Damages § 566 (1988 & Supp. 1999.) Thus, "where the injured plaintiff's compensation comes from a `collateral source,' it should not be offset against the sum awarded for the tort nor considered in determining that award." United States v. Price, 288 F.2d 448, 449 (4th Cir. 1961). Often termed the"collateral source" rule,[6] it provides that "compensation from a collateral source should be disregarded in assessing tort damages[.]" Id. at 449-50. Under this well-established rule, UHP is not entitled to an offset if: (1) UHP's liability at trial was based on a jury determination that UHP was a tortfeasor; and (2) the settlement between Mr. Chisholm and Sealift constituted a "collateral source" payment. Because this test is squarely satisfied here, UHP should not receive an offset for monies paid by Sealift to Mr. Chisholm.
 
 1.
 
 39
 First, under the facts before us, there is no doubt that UHP is a tortfeasor. A stevedore[7] -like UHP -cannot be liable to either a ship or seaman unless it is established that the stevedore was at fault. For example, in order for a seaman to recover against a stevedore, the seaman must establish fault on the part of the stevedore: that the stevedore breached the warranty of workmanlike performance. See Sanderlin v. Old Dominion Stevedoring Corp., 385 F.2d 79, 81-82 (4th Cir. 1967). In this case, Mr. Chisholm presented his case to a jury, and that jury was properly instructed that UHP's liability was not without fault. In fact, the district court's instructions to the jury, without objection from UHP, underscored that UHP's liability depended upon its breach of a duty running to Mr. Chisholm.[8] In finding UHP liable, the jury thus determined that UHP had utilized equipment that was not "reasonably safe and fit for its intended use," notwithstanding the court's instruction that: (1)"there is no requirement that the defendant supply absolutely perfect equipment[;] and (2) "[m]erely because the equipment may have resulted in an injury to the plaintiff is not of itself sufficient to prove that the defendant breached its warranty of workmanlike performance." In this regard, the jury determined that UHP was at fault[9] in this accident, and on this basis, UHP satisfies the first element of the collateral source rule -that UHP is a tortfeasor.[10]
 
 
 40
 To avoid the label "tortfeasor," the majority relies upon the fact that UHP was strictly liable for all damages caused by its breach of the implied warranty of workmanlike performance. This argument is a red herring. Even the majority would concede that a product manufacturer is a tortfeasor if the manufacturer is held strictly liable for damages caused by its defective product. See, e.g., Lui v. Barnhart, 987 P.2d 942, 944-45 (Colo. Ct. App. 1999) ("Strict liability in tort does not require proof of fault. Generally, it is applied in those situations -such as those involving product liability, ultrahazardous activities, and trespass -that inherently may inure to the harm of another regardless of the conduct of the tortfeasor. Such liability is established by proving the nature of the dangerous product or activity without regard to a defendant's actions.") (citations and quotations omitted and emphasis added) (citing Restatement (Second) of Torts § 402A (elements of strict liability in tort for product liability claims) & § 520 (abnormally dangerous activities) (1965)); Wagatsuma v. Patch, 879 P.2d 572, 582 (Haw. Ct. App. 1994) ("A party who asserts that his or her injuries were caused by a defective product may proceed against the alleged tortfeasor under principles of negligence and/or strict liability.") (citations omitted and emphasis added); Reed v. Central Soya Co., Inc., 621 N.E.2d 1069, 1073 (Ind. 1993)("[I]n the same way that negligent tortfeasors are subject to liability for property damage caused by their negligence, sellers became subject to strict liability in tort for property damage caused by a defective product.") (emphasis added).
 
 
 41
 Like any product manufacturer that releases a defective product, a stevedore that breaches the implied warranty of workmanlike performance is thus a tortfeasor.[11] Indeed, "the Supreme Court has analogized the stevedore's warranty to that of a manufacturer, who expressly or impliedly guarantees the fitness of his product for normal use. Consequently, the developing jurisprudence of the stevedore's warranty directly parallels the burgeoning law of manufacturer's product liability." Sanderlin, 385 F.2d at 81 (citations omitted). Because UHP's liability before the jury depended upon a demonstration of fault and because Mr. Chisholm has made that showing, the first element of the collateral source rule -that UHP is a tortfeasor -is clearly satisfied.
 
 2.
 
 42
 Turning to the second element of the collateral source rule -whether Sealift's settlement with Mr. Chisholm constitutes a "collateral source" payment -there is no doubt that Sealift's obligations and settlement thereof were separate from, and collateral to, UHP's liability. A ship -unlike a stevedore -is the virtual insurer of a seaman, and Sealift's settlement with Mr. Chisholm was truly based on liability without fault. We must therefore answer the question posed by the second element in the affirmative.
 
 
 43
 At the outset, wages, vacation, sick pay, and workers' compensation benefits paid by an employer are time-honored collateral sources. See 22 Am. Jur. 2d Damages §§ 574, 576 & 579 (1988 & Supp. 1999)(e.g.,"Recovery under workers' compensation statutes usually does not reduce the liability of a tortfeasor, who is not the plaintiff's employer, for damages"). Here, the ship's settlement with Mr. Chisholm sought to compensate him for, inter alia , "wages to the end of the voyage and subsistence, lodging and care." See supra note 2. Because these payments were truly without regard to the ship's fault (and UHP does not argue otherwise), and because these payments were virtually identical to these established collateral sources -wages, vacation, sick pay, and workers' compensation benefits -the ship's settlement is a collateral source payment.
 
 
 44
 However, even to the extent that Sealift's settlement is not precisely the same as workers' compensation or the other established collateral sources, that settlement clearly meets the more general definition of a collateral source. When we evaluate whether a source is collateral, our determination depends upon "the purpose and nature of the fund, and not merely . . . their source."[12] Russo v. Matson Navigation Co., 486 F.2d 1018, 1020 (9th Cir. 1973) (quotation and citation omitted). In this vein, the "liability to which the undoubted [breach of duty] of [UHP] exposed [Sealift] was not merely that of a joint tort-feasor, it was the liability without fault attaching to an unseaworthy ship." Boykin, 73 F.3d at 544. Because Sealift's payments for, inter alia, unseaworthiness and maintenance and cure sought to satisfy legal obligations separate and collateral to the tort damages award against UHP, the ship's settlement is properly to be regarded as a collateral source payment.
 
 
 45
 Put simply, the collateral source rule recognizes that: (1) granting an offset would permit a "windfall to the defendant wrongdoer[;]" and (2) "ordinary damages [are unable] to adequately compensate an injured accident victim." Clausen, 21 F.3d at 1193 n.18 (quotation omitted). In avoiding a windfall to the tortfeasor, it is true that "the most obvious effect of the collateral source rule is that it enables a plaintiff to reap a double recovery in certain circumstances. In other words, the collateral source rule is an exception to the general rule that damages in tort should be compensatory only." Id. at 1192 (quotation and citation omitted). However, as between the party solely at fault here -UHP -and the innocent accident victim -Mr. Chisholm, the "windfall" should inure to Mr. Chisholm, and the collateral source rule should be applied to that end. As a result, I would reverse the district court's judgment.
 
 B.
 
 46
 The majority's "equitable" offset thus inappropriately rewards a tortfeasor by voiding the victim's tort damages award. Unfortunately, however, this new rule will have more damaging consequences beyond this case. That is, the circumstances present here -a stevedore's breach of duty causing an injury to a seaman in the course of the seaman's service to a vessel -is not new to the federal courts, and the Supreme Court and the other federal courts have developed a comprehensive scheme that fully allocates the risks, equities, and procedures between the seaman, the ship, and the stevedore. In the careful development of this scheme, the federal courts sitting in admiralty have explicitly and repeatedly rejected the"equitable" offset adopted by the majority in this case. This offset has been rejected for good reason: the existing scheme promotes core values, like the encouragement of settlements and judicial economy, and an equitable offset undermines these values.
 
 
 47
 Under the existing scheme, the interests of the injured seaman are paramount, and for that reason, the shipowner bears the first line of liability to a seaman for any injuries during his service to the ship. "The doctrines of maintenance and cure and of unseaworthiness have been developed to give seamen no-fault damage recovery in recognition of the dangerous character of their work and their quasi-captive status during their voyage." Flunker v. United States, 528 F.2d 239, 242 (9th Cir. 1975) (citing G. Gilmore & C. Black, The Law of Admiralty, 281, 393 (1975)). Thus, a shipowner must cover, without regard to fault, inter alia, the expenses and wages of a seaman injured in the course of his service to the ship.
 
 
 48
 However, it had been widely recognized that under this scheme, shipowners "often are held vicariously liable for the acts of third persons causing injury to seamen[.]" Flunker , 528 F.2d at 242. To ease this burden, the Supreme Court developed a theory of indemnification, whereby a shipowner may recover in indemnity from an at-fault stevedore[13] under certain circumstances. See Ryan Stevedoring Co., Inc. v. Pan-Atlantic S.S. Corp., 350 U.S. 124 (1956).[14] This right to indemnification is not without limits; in fact, in applying this indemnity doctrine, courts have erected numerous protections, in favor of the stevedore, against unfair liability and unequal damages. For example, before a ship can recover in indemnity against a stevedore, the ship must meet a burdensome test:
 
 
 49
 [F]irst, an indemnitor-indemnitee relationship must exist; second, the indemnitee must demonstrate that it was under some compulsion to satisfy the original claim of the plaintiff; third, the indemnitee must prove that its settlement with the plaintiff in the underlying action was reasonable; and fourth, the indemnitee must show that the unlawful act of the indemnitor proximately caused the injury to the original plaintiff. An additional requirement is that the proposed indemnitor be notified of the underlying claim and tendered the defense of the claim.
 
 
 50
 Boykin, 73 F.3d at 543; see also Vaughn v. Farrell Lines, Inc., 937 F.2d 953, 956-57 (4th Cir. 1991) (quotations and citations omitted). Thus, among other protections, the shipowner must establish that the stevedore acted "unlawful[ly]" before a shipowner can recover in indemnity. Vaughn, 937 F.2d at 957. Therefore, "[i]t is not sufficient that compulsion for the indemnitee to satisfy the plaintiff's claim be shown. [Rather, t]he indemnitor `is entitled to try the question of its own wrongdoing.'" Id. (quoting Maritime Overseas Corp. v. United States, 608 F.2d 1260, 1261 (9th Cir. 1979)). This same rule is followed with respect to a suit by a seaman directly against a stevedore, and, as indicated above, a seaman may only recover if he can demonstrate that the stevedore was at fault.
 
 
 51
 In this regard, the existing scheme addresses each of the "equitable" concerns raised by UHP, the district court, and the panel majority. For example, UHP asserts that the existing scheme forces the stevedore to pay twice -once in strict liability to the seaman and once in indemnity to the shipowner. This assertion is simply wrong. Under the existing scheme, if the stevedore causes an injury to a seaman in the course of the seaman's service to a ship, the stevedore is given the right to take charge of the defense of all claims arising out of that injury and litigate (or settle) them together. In fact, if the shipowner does not notify the stevedore of the claim and tender the defense, the stevedore cannot be liable in indemnity. See Boykin, 73 F.3d at 543. Our scheme also gives the stevedore additional leverage under these circumstances: the stevedore tortfeasor can refuse to settle any of the claims without a global settlement releasing both the ship and the stevedore. Thus, if the stevedore participates within the existing scheme, there should be no danger of double liability.
 
 
 52
 Similarly, UHP contends that the district court's offset was justified because "the shipowner has no incentive to strike a fair or reasonable settlement, but rather, to strike any settlement." Br. for Appellee at 8 (emphasis in original). This is entirely incorrect; in truth, the shipowner has the burden, in an indemnity suit, to"prove that its settlement with the plaintiff in the underlying action was reasonable[.]" Boykin, 73 F.3d at 543. Thus, even if there were no inherent incentive in avoiding an unreasonable settlement, the indemnity rules require as much. To the extent that the shipowner's settlement is unreasonable, the ship may be unable to establish the stevedore's liability for that settlement, or some part there of.
 
 
 53
 The existing scheme of liability and indemnity thus fairly and appropriately allocates the risks and responsibilities. But our existing, carefully developed scheme does more; it also advances two of the "[paramount] considerations" that guide the development of remedies in admiralty law: "promotion of settlement[ ] and judicial economy." McDermott v. AmClyde, 511 U.S. 202, 211 (1994). That is, the existing scheme encourages the ship, the stevedore, and the seaman to negotiate, litigate, and settle the claims together. Notably, if any of the defendants opt-out of the scheme, that party bears risks; to wit, if the ship elects not to notify and tender the defense of the claim to the stevedore, the ship is not entitled to indemnity. Similarly, if the stevedore declines to defend the ship under these circumstances, then the stevedore loses, inter alia, the ability to leverage the ship's settlement against its own settlement. This scheme also promotes judicial economy by effectively requiring the parties to litigate these claims in a single lawsuit.
 
 
 54
 Applying this scheme to the facts here, UHP is the last party that would be entitled to an "equitable" offset. Sealift tendered the defense Mr. Chisholm's claim three separate times -in April, May and June of 1996. UHP consistently declined to participate in any respect, leaving the ship with the burden of settling Mr. Chisholm's claims. Then, UHP litigated two separate cases: one against Sealift and one against Mr. Chisholm. Rather than settling Mr. Chisholm's case, UHP decided to settle Sealift's indemnity claim. Thus, UHP's conduct led to two separate lawsuits -clearly undermining the goals of judicial economy and promotion of settlement. We should not endorse this obstreperous conduct by now permitting UHP an "equitable" offset. In this light, the majority's rule effectively permits UHP a second opportunity at an offset, duplicating the opportunity that UHP would have had if it had taken over the defense of Mr. Chisholm's claim against Sealift. But this new rule is not mere benign redundancy. Practically speaking, the tortfeasor is now in "the catbird seat," and under the majority's rule, stevedores should never settle. Rather, the tortfeasor should take UHP's posture: (1) force the ship to defend itself and settle the case on its own; then (2) litigate against ship and the seaman, content in the knowledge that no matter what the ultimate award, the tortfeasor will be entitled to an offset.
 
 C.
 
 55
 In fact, the Supreme Court has flatly rejected the application of a "single recovery" rule in circumstances closely analogous to those here, and the reasons underlying that rejection recognize the comprehensive nature of the existing scheme. See McDermott, 511 U.S. at 202. In McDermott, the plaintiff was moving an oil and gas production platform ("deck") from a barge to a structural steel base affixed to the floor of the Gulf of Mexico using a newly-purchased crane, when one of the prongs on the crane's main hook broke, causing extensive damage to both the deck and the crane. The plaintiff sued five parties in admiralty: (1) the crane manufacturer ("crane defendant"); (2) the hook manufacturer ("hook defendant"); (3) and three manufacturers of the supporting steel slings incorporated into the crane (collectively the "sling defendants"). Id. at 205. On the eve of trial, the plaintiff settled with the three sling defendants for $1 million. The case then went to trial, and the jury assessed the plaintiff's total damages at $2.1 million, allocating responsibility among the parties: 32% to the crane defendant; 38% to the hook defendant; and 30% jointly to the plaintiff and the sling defendants. The district court thereafter entered a judgment against the crane defendant for $672,000 (32% of $2.1 million) and against the hook defendant for $798,000 (38% of 2.1 million), even though these two payments, when coupled with the sling defendants' settlement, permitted the plaintiff to receive a total of $2.47 million, $370,000 more than the jury had assessed as the plaintiff's total damages. The Fifth Circuit Court of Appeals then reversed this judgment, opting instead for an offset in favor of the non-settling defendants.
 
 
 56
 The Supreme Court reversed the Court of Appeals, and it reinstated the district court's judgment. In so doing, the Court denied the offset and permitted the plaintiff to collect damages that totaled an amount greater than that awarded by the jury. Justice Stevens, writing for a unanimous Court, underscored why an offset was not appropriate, and the language utilized is closely applicable to this case. I therefore quote the relevant portion in some length:
 
 
 57
 Even if the Court of Appeals were correct in finding that the proportionate share approach would overcompensate[the plaintiff], we would not apply the one satisfaction rule. The law contains no rigid rule against overcompensation. Several doctrines, such as the collateral [source] rule, recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation. In this case, any excess recovery is entirely attributable to the fact that the [settling] defendants may have made an unwise settlement. It seems probable that in most cases in which there is a partial settlement, the plaintiff is more apt to accept less than the proportionate share that the jury might later assess against the settling defendant, because of the uncertainty of recovery at the time of settlement negotiations and because the first settlement normally improves the plaintiff's litigating posture against the nonsettlors. In such cases, the entire burden of applying a proportionate share rule would rest on the plaintiff, and the interest in avoiding overcompensation would be absent. More fundamentally, we must recognize that settlements frequently result in the plaintiff's getting more than he would have been entitled to at trial. Because settlement amounts are based on rough estimates of liability, anticipated savings in litigation costs, and a host of other factors, they will rarely match exactly the amounts a trier of fact would have set. It seems to us that a plaintiff's good fortune in striking a favorable bargain with one defendant gives other defendants no claim to pay less than their proportionate share of the total loss. In fact, one of the virtues of the proportionate share rule is that, unlike the pro tanto rule, it does not make a litigating defendant's liability dependent on the amount of a settlement negotiated by others without regard to its interests.
 
 
 58
 McDermott, 511 U.S. at 219-220. If, in McDermott, a unanimous Supreme Court declined to offset the judgment against a non-settling tortfeasor by the amounts paid by a settling tortfeasor, then surely the award against a non-settling tortfeasor (UHP) should not be offset by the payments by an innocent insurer (Sealift).
 
 
 59
 In other words, the proportionate share rule, as articulated by the Supreme Court, is that: "The money paid [by a settling tortfeasor] extinguishes any claim that the injured party has against the released tortfeasor and also diminishes the claim that the injured party has against the other tortfeasor by the amount of the equitable share of the obligation of the released tortfeasor." McDermott, 511 U.S. at 209 (emphasis added). In this case, where the non-settling party (UHP) bears 100% of the fault and the settling party (Sealift) bears 0% of the fault, the proportionate share rule, by definition, would not "apply in favor of non-settling defendants." Boykin, 73 F.3d at 544. An application of that rule to this case illustrates why this is so: Because UHP is completely at fault and Sealift bears none of the fault, the proportionate share rule would work to diminish UHP's $90,000 damage award by absolutely nothing.[15]
 
 
 60
 We should not ignore the guidance[16] that McDermott provided in denying an offset, notwithstanding the fact that the plaintiff's recovery exceeded the plaintiff's total damages as determined at trial. In fact, this case presents facts that form a much stronger basis for the denial of an offset than those present in McDermott. While the McDermott Court denied an offset relying generally upon "[s]everal doctrines, such as the collateral [source] rule, [which] recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation[,]" in this case, the offset must be denied, not only under the general guidance of McDermott, but also directly under the collateral source rule.
 
 D.
 
 61
 That the majority's new rule undermines core values encompassed in our existing scheme and runs contrary to Supreme Court guidance is all the more frustrating given that it is unsupported by any precedent. Indeed, UHP conceded that there is no legal authority for an offset in these circumstances. Nonetheless, the majority artfully attempts to create the illusion of legal support by relying upon four cases in which, outside the admiralty context,[17] courts permitted one joint tortfeasor to offset its damages with a settlement by the other joint tortfeasor.[18] First, the majority's reliance on this joint-tortfeasor authority is ironic to say the least: Before citing these cases, the majority explained, at length, that the McDermott rule, which was applied in both Boykin and Westinghouse to deny an offset, only applies to prohibit an offset when the settling and non-settling parties are determined to be joint tortfeasors. Because, the majority reasons, UHP and Sealift are not joint tortfeasors, the McDermott rule prohibiting an offset is not available to Mr. Chisholm. Ante at 734-37. Then, in the same breath, the majority relies upon these four cases to justify the application of the "single recovery rule." Significantly, each of those cases permitted an offset only after determining that the settling and non-settling defendants were, in fact-in each instance -joint tortfeasors. Under this reasoning, the majority's authority is inapplicable for the same reason that McDermott's rule would be inapplicable: UHP and Sealift are not joint tortfeasors. Further, the discrepancy revealed by the majority's reasoning -that "single recovery" offsets are permitted between joint tortfeasors in other contexts but are not permitted in admiralty -serves only to illustrate that admiralty law is different. In admiralty, these offsets have been rejected in favor of a comprehensive scheme, and the majority's legal authority -based upon non-admiralty law -is thus inapposite.
 
 
 62
 Second, one of the authorities relied upon by the majority actually does much to demonstrate why no offset should be permitted in this case. In that case, Kreiser v. Hobbs, 166 F.3d 736, 743 (5th Cir. 1999), the Fifth Circuit explained:
 
 
 63
 Set-offs for settlement and the "one-satisfaction" rule exist to prevent the plaintiff from recovering twice from the same assessment of liability.[19] But, where liability is not joint-and-several, and each defendant instead bears liability for damages only proportionate to his own fault, there is no assessment of liability for damages common to the settling and non-settling defendants. Accordingly, the settlement has an entirely separate basis from the apportioned damages, and the one-recovery rule does not apply. The "one satisfaction" rule applies to situations like the one in[Turner v. Pickens, 711 So. 2d 891 (Miss. 1998)], in which liability from two parties is rooted in a single source (there, the remittitur). Where, as here, liability or payment is separately rooted, the rule is inapposite.
 
 
 64
 In other words, what may seem at first blush to be"unfair" is not unfair, not only because admiralty law has decided to promote other values, including, inter alia, the interests of the seaman, the encouragement of settlements, and judicial economy, but also because Sealift and UHP had different sources of liability. Put simply, the majority has cited no authority that supports the application of this new "equitable" rule, and I am unable to endorse it.
 
 III.
 
 65
 This decision rewards UHP -an obstreperous tortfeasor -by permitting an offset for monies that Mr. Chisholm received from a collateral source; the net result being that Mr. Chisholm receives no damages in tort. As such, the majority opinion is unsupported by any legal authority; it misapprehends the facts; it misapplies the law to the facts; and the landmark result it reaches inadvertently undermines a carefully developed, comprehensive scheme. I believe that this tortfeasor -UHP -should be required to fully satisfy the damages awarded against it in tort, but unfortunately, because this tribunal blunders, the tortfeasor goes free. I cannot endorse this new "equitable" rule or join in this result, and I therefore dissent.
 
 
 
 Notes:
 
 
 [1]
 The "dura" is the outermost membrane covering the brain, adhering to the inner layer of the skull. See Dorland's Medical Dictionary, at 512 (28th ed. 1994).
 
 
 [2]
 "Maintenance and cure -a right given by the general maritime law in consequence of the seaman's status resulting from any shipping contract between the seaman and the master or the vessel -gives to the seaman, ill or injured in the service of the ship without willful misbehavior on his part, wages to the end of the voyage and subsistence, lodging and care to the point where the maximum cure attainable has been reached." See Martin J. Norris, The Law of Seamen § 26:2 (4th ed. 1985).
 
 
 [3]
 Shipowners owe seamen a nondelegable duty to provide a ship -including the "ship's hull, gear, appliances, ways, appurtenances and manning" -that will be "reasonably fit for its intended purpose." Norris at § 27:2. This is a "species of liability without fault and is not limited by conceptions of negligence." Id. at§ 27:3.
 
 
 [4]
 The district court granted partial summary judgment to UHP on Mr. Chisholm's negligence claim after determining that Mr. Chisholm had "no evidence of negligence." J.A. 103.
 
 
 [5]
 According to the district court,"[t]he jury was unaware of the prior settlements." J.A. 108.
 
 
 [6]
 The "collateral source" rule has been often applied in admiralty cases. See, e.g., Bourque v. Diamond M. Drilling Co., 623 F.2d 351, 354 n.2 (5th Cir. 1980) ("The collateral source rule is applicable to suits brought under the Jones Act").
 
 
 [7]
 A "stevedore" is technically "[a] person employed in loading and unloading vessels." See Black's Law Dictionary 1414 (6th ed. 1990). However, parties that perform maintenance on vessels, like UHP, are effectively treated as stevedores, see infra note 13, and I therefore use the term "stevedore" to include third parties like UHP.
 
 
 [8]
 The district court's instructions relating to UHP's liability provided, it pertinent part:
 In order to recover on this claim, the plaintiff has the burden of proving two essential elements by a preponderance of the evidence. These elements are, first, the defendant breached its warranty of workmanlike performance; and, second, that this breach was a proximate cause of the injury to the plaintiff.
 The implied warranty of workmanlike performance applies to all work done by a contractor, such as a defendant who performs maintenance or repair services on a ship or vessel. Accordingly, as a matter of law, the defendant warranted and promised to Sealift and to all of its employees, including the plaintiff, that it would perform its work on the ULTRAMAX in a workmanlike manner. The implied warranty of workmanlike performance required the defendant to perform and complete its work with reasonable safety and to supply reasonably safe equipment. Under this implied warranty, there is no requirement that the defendant supply absolutely perfect equipment.
 With this in mind, you must find that the defendant breached its implied warranty of workmanlike performance if you find the defendant did not perform its work in the ULTRAMAX with reasonable safety or if you find that the defendant's equipment used on the ULTRAMAX was not reasonably safe.
 This suit is not based on the negligence of the defendant, as there is no proof of any negligence on the part of the defendant, nor is there any showing that the defendant did not perform its work with reasonable safety. The only issue that you may consider in this case is whether the defendant's equipment was in fact reasonably safe and fit for its intended use. Merely because the equipment may have resulted in an injury to the plaintiff is not of itself sufficient to prove that the defendant breached its warranty of workmanlike performance. Transcript of Trial Proceedings, August 19, 1998, at 341-42.
 
 
 [9]
 Although the district court framed the issue as one of strict liability, the court's instructions -by utilizing the term"reasonable" -actually required a finding less like "strict liability" and more akin to "negligence." See supra note 8 ("The implied warranty of workmanlike performance required the defendant to perform and complete its work with reasonable safety and to supply reasonably safe equipment. . . . The only issue that you may consider in this case is whether the defendant's equipment was in fact reasonably safe and fit for its intended use.")
 
 
 [10]
 A "tortfeasor" is "[a] wrongdoer; an individual or business that commits or is guilty of a tort." Black's Law Dictionary 1489.
 
 
 [11]
 Put simply, there is a significant difference, as a matter of law, between "negligence," "strict liability," and "no fault liability." That the majority can promulgate its new equitable offset only by obfuscating the difference between these theories of liability further underscores the incorrect nature of the result reached here. The record is clear that UHP was held strictly liable (and not held liable without fault), and, by contrast, that Sealift was liable without fault. Because strict liability is not the same as liability without fault, the majority's incorrect premise -that UHP was "liable without fault" (ante at 737)-leaves the majority's conclusions therefrom fatally flawed.
 In a similar vein, the majority opinion artfully relies upon the district court's holding that Mr. Chisholm was not entitled to a jury, claiming that this holding means that UHP was liable without fault. Ante at 733 n.1. This assertion is both wrong and misleading. In truth, Mr. Chisholm's only common law claim (and the only claim that permitted him to demand a jury) was his negligence claim, which was dismissed. Mr. Chisholm then successfully proceeded on his claim in admiralty -breach of the implied warranty of workmanlike performance -for which he was not entitled to a jury, and which is a strict liability claim. Lack of negligence is not co-extensive with lack of fault; therefore, by conceding that there was no evidence of UHP's negligence, Mr. Chisholm did not concede, and the district court did not conclude, that UHP was liable without fault. In short, the dismissal of the negligence claim is irrelevant to the ultimate basis of UHP's liability: strict liability, which is liability with fault.
 
 
 [12]
 Under this analysis, it makes no difference that UHP has settled with Sealift -thereby reimbursing Sealift for its settlement with Mr. Chisholm -inasmuch as a defendant himself may be the"collateral source" from which the additional benefit comes. Price , 288 F.2d at 450 ("The plaintiff may receive benefits from the defendant himself which, because of their nature, are not considered double compensation for the same injury but deemed collateral.").
 
 
 [13]
 Ryan, supra, initially applied only to stevedores, but this indemnification doctrine has since been applied to non-stevedore tortfeasors, like UHP. See Tebbs v. Baker-Whitely Towing Co., 407 F.2d 1055, 1058 n.1 (4th Cir. 1969). In addition, the doctrine now applies even where no contractual indemnitor-indemnitee relationship exists. Waterman S.S. Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 423-24 (1960).
 
 
 [14]
 Ryan has been overruled in part by statute; however, the part overruled is not of relevance here. See Int'l Surplus Lines Ins. Co. v. Marsh & McLennan, 838 F.2d 124 (4th Cir. 1988).
 
 
 [15]
 That is, the offset under the proportionate share rule would be Sealift's share of the obligation (0%) multiplied by the factfinder's assessment of the plaintiff's damages ($90,000), which equals zero.
 
 
 [16]
 I have no quarrel with the majority that McDermott does not control this case because the award of damages there followed a determination that the defendants were joint tortfeasors, while no such determination can be made here. Nonetheless, UHP is a tortfeasor, and the case thus provides clear guidance for ruling against an offset for UHP's benefit.
 
 
 [17]
 See Howard v. General Cable Corp., 674 F.2d 351, 358 (5th Cir. 1982) (applying Texas law); Ratner v. Sioux Natural Gas Corp., 719 F.2d 801 (5th Cir. 1983) (applying Texas law and federal securities laws); Marcus, Stowell & Beye Government Sec., Inc. v. Jefferson Investment Corp., 797 F.2d 227, 233 (5th Cir. 1986) (applying Texas law); Harris v. Union Electric Co., 846 F.2d 482, 485 (8th Cir. 1988) (applying federal securities laws).
 
 
 [18]
 In Howard, 674 F.2d at 358, the plaintiff had sued all of the defendants -settling and nonsettling -under tort theories of liability. The plaintiff then settled with two of the defendants and, subsequently, won an award of tort damages against the third defendant. The only question was whether the three tortfeasors caused "common damages" or separate damages. The Fifth Circuit determined that the damages were "common damages" because: (1) the two settling defendants had divided the settlement equally (and if the settlement had included exemplary damages (sought against only one of the settling defendants), the party against whom those damages were sought would have been required to pay a larger share); (2) there was a "remarkable similarity between the settlement figure and the amount of damages assessed by the jury[,]" which supported the notion that the settlement and the jury award represented the total damages to the plaintiff. Having effectively determined that three tortfeasors caused common damages, the court permitted an offset under Texas's "one satisfaction" rule.
 Similarly, in Ratner, supra, the court noted that for the one satisfaction rule to apply, the "credit to be claimed by a joint tort-feasor is confined to those damages for which all tort-feasors are equally liable.'" Ratner, 719 F.2d at 804 (quoting Hill v. Budget Finance & Thrift Co., 383 S.W.2d 79, 81 (Tex. Civ. App. 1964)). Nonetheless, the court remanded the case for a determination of the applicability of the "one satisfaction" rule under Texas law after noting that the district court had held "all four defendants jointly and severally liable for both actual and punitive damages." Ratner, 719 F.2d at 804. See also Marcus, Stowell & Beye, 797 F.2d at 233 (Fifth Circuit permits offset under"one satisfaction" rule only because "the breaching party[ ] and. . . the party inducing the breach, were jointly and severally liable under Texas law for [plaintiff's] single injury."); Harris, 846 F.2d at 485 (holding that "one satisfaction" rule offset was warranted only after determining that the liabilities of the settling party and the non-settling party were "joint and concurrent.")
 
 
 [19]
 That there is no single "assessment of liability" is another deficiency in application of the "one satisfaction" rule in these circumstances, because the absence of this "assessment" requires district court to speculate in order to apply this new offset. Prior to this case, courts could only apply the "one satisfaction rule" offset after the factfinder determined: (1) the plaintiff's total damages; and (2) that the settling and non-setting parties were jointly and severally liable. Following these findings of fact, the court could then offset the non-settling party's damage award by the settlement paid by the settling party (against whom co-extensive liability had been established) if the plaintiff would otherwise recover an award in excess of his total damages. Because the factfinder had made the necessary determinations, the court could reasonably conclude that monies paid by the settling party sought to extinguish the same liability for which the non-settling joint tortfeasor was subsequently held liable.
 By contrast, the majority's new application of the"one satisfaction rule" forces courts to speculate about whether the liability of the settling and non-settling parties, although under different theories of liability, was, nonetheless, co-extensive. For example, in this case, the majority, by offsetting the damage award against UHP by Sealift's settlement, implicitly concludes that Sealift's liability was co-extensive with UHP's liability. As is illustrated below, this conclusion is based on nothing but speculation.
 First, as UHP made clear at oral argument, Sealift's suit against UHP for indemnity was based upon two theories of liability: (1) breach of the implied warranty of workmanlike performance; and (2) negligence. In fact, Sealift was seeking $200,000 for UHP's negligence, in addition to the $229,025.93 that Sealift had paid to Mr. Chisholm. Faced with these two theories of liability, UHP chose to settle for $229,025.93 and thereby obtain a release against both the negligence and strict liability claims. Second, UHP's counsel asserted at oral argument that: "there was evidence at trial that there was . . . a problem with the ship's water supply." In other words, even at trial, there was some evidence that Sealift could have been partially at fault in this accident, although this theory was not litigated at trial. Thus, UHP and Sealift arguably faced liabilities in tort that were not co-extensive.
 These facts notwithstanding, the majority speculates that Sealift's settlement with Mr. Chisholm relieved liabilities caused entirely by UHP, and that UHP's settlement with Sealift satisfied all claims for damages arising out of UHP's breach. Were we to speculate in this manner, however, an equally plausible scenario is that Sealift settled with Mr. Chisholm because "there was a problem with the ship's water supply" that caused part of Mr. Chisholm's injury, and Sealift settled immediately to avoid extensive liability. Similarly, an equally plausible alternative is that UHP settled with Sealift to avoid an additional $200,000 in liability arising out of UHP's negligence. That there are equally plausible but similarly speculative scenarios merely reveals that the liabilities of UHP and Sealift were not necessarily coextensive; indeed, we will never know what liability these two parties would have faced had their cases gone to trial. In this light, the majority's new rule unreasonably forces courts to speculate about what liabilities moved the settling party to settle.