**BALTIMORE NEIGHBORHOODS, INC., and Kevin Beverly,**

v.

**LOB INC., and Lions Gate Garden Condominiums, Inc.**

No. B–96–914.

United States District Court, D. Maryland.

April 20, 2000.

458

Lauren E. Willis, Andrew D. Levy, Brown, Goldstein & Levy, LLC, Baltimore, MD, for plaintiffs.

Michael P. Darrow, M. Evelyn Spurgin, Hillman, Brown, Darrow Annapolis, MD, for defendant LOB, Inc. Frederick C. Sussman, Susan Stobbart Shapiro, Council, Baradel, Kosmerl & Nolan, P.A., Annapolis, MD, for defendant Lions Gate Garden Condominium.

Bill Lann Lee, Acting Assistant Attorney General, Civil Rights Division, Joan A. Magagna, Chief, Brian F. Heffernan, Deputy Chief, Myron S. Lehtman, Attorney, Housing and Civil Enforcement Section of the Civil Rights Division of the Department of Justice, Washington, DC, Lynne A. Battaglia, United States Attorney and Perry Sekus, Assistant United States Attorney, Baltimore, MD, for United States as amicus curiae.

WALTER E. BLACK, Jr., Senior District Judge.

Plaintiffs, Baltimore Neighborhoods, Inc. ("BNI") and Kevin Beverly bring this action against defendants LOB, Inc. and Lions Gate Garden Condominium, Inc. ("LGGCI") alleging violations of Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181 *et seq.*, ("ADA") and the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3601 *et seq.,* as amended. More specifically, plaintiffs allege that LOB violated the ADA, 42 U.S.C. § 12183(a)(1), by placing the sales center for Lions Gate Garden Condominiums ("Lions Gate") in a location that was inaccessible to persons with disabilities, and that LOB violated the FHAA, 42 U.S.C. § 3604(f), by designing and constructing specified ground floor units and the common use areas of Lions Gate so that they are not usable by persons who are mobility impaired. Plaintiffs seek monetary damages, declaratory relief, equitable relief and attorneys' fees.[1]

This case was tried to the Court from November 8, 1999 through November 16, 1999. Following the submission of post-trial briefs by the parties and a brief of the United States filed as *amicus curiae* in support of equitable relief, the Court heard closing argument on February 9, 2000. This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**I.**

Lions Gate is a condominium development located in Odenton, Anne Arundel County, Maryland. The development consists of thirteen buildings, each containing twelve condominium units.[2] Each of the buildings contains three floors, and each floor contains four units. All of the buildings have light grey siding, white trim, balconies, and an open stairwell in the middle of the building. The development is landscaped with various trees and shrubs, which are maturing. Currently, Lions Gate has approximately three hundred residents. The majority of the units are owner occupied, and many of the residents have children or pets.

Defendant LOB purchased the land to develop Lions Gate in 1990. LOB and John Rommel then formed Lions Gate Joint Venture to construct the development.[3] Rommel Builders, a construction company in which John Rommel owns a 50% interest, was responsible for constructing the buildings, and LOB was responsible for developing the exterior, including the roads, curbs, gutters and storm drains.[4]

Plaintiff BNI is a private nonprofit organization that promotes equal housing opportunities in the Baltimore/Washington area. BNI has approximately seven hundred members, twenty-five of whom live in Anne Arundel County, and four or five of whom use a wheelchair for mobility. According to Martin Dyer, the Associate Director of BNI, the organization is involved in such activities as fair housing enforce-

---

1. Plaintiffs also sought punitive damages. The Court, however, granted defendant LOB's motion for judgment on the issue of punitive damages because plaintiffs failed to prove that LOB acted recklessly or with callous indifference.

2. The addresses for the buildings at issue are:
 Building 3—606 Rolling Hill Walk
 Building 4—604 Rolling Hill Walk
 Building 5—602 Rolling Hill Walk
 Building 6—600 Rolling Hill Walk
 Building 7—606 Moonglow Road
 Building 8—604 Moonglow Road

 Building 9—602 Moonglow Road
 Building 10—600 Moonglow Road
 Building 11—600 Resty Lane
 Building 12—601 Forest Walk Lane
 Building 13—603 Forest Walk Lane

3. LOB has an 80% interest in Lions Gate Joint Venture, and John Rommel has a 20% interest.

4. John Rommel is the Chairman and CEO of Rommel Builders. Michael Baldwin is the president and owns the remaining 50% interest in the company.

ment, tenant-landlord counseling, tenant organizing, and counseling for persons with Section 8 certificates who are seeking housing in the suburbs.

In 1993, BNI began testing multifamily dwellings for compliance with the FHAA and ADA. In February 1996, BNI hired plaintiff Kevin Beverly to test Lions Gate after a survey of the development revealed widespread inaccessibility. Beverly testified that at the time he tested Lions Gate he was also looking for a new home for his family. Beverly has limited use of his legs and uses a wheelchair for mobility.

When Beverly arrived at Lions Gate, he discovered that the sales office was located on the second floor of one of the buildings. Beverly testified that gaining access to the building would have required him to go down a flight of stairs. He then would have been required to go up a flight of stairs to gain access to the second floor sales office. Because the stairs prevented Beverly from entering the sales office, he remained in his vehicle and called the telephone number on the sales sign from his car phone. When a sales representative answered, Beverly stated that he was outside the office and that he was interested in purchasing a two-bedroom wheelchair accessible unit. The representative proceeded to give Beverly a "sales pitch" about Lions Gate. She also informed Beverly that they did not have any wheelchair accessible units for sale, but a condominium owner was selling a unit that had been modified to make it handicapped accessible. At the conclusion of the conversation, the sales representative instructed Beverly to call and make an appointment if he was interested in that unit.

After testing Lions Gate, Beverly and BNI filed this action alleging that the defendants failed to meet the accessability requirements of the FHAA and ADA.[5] On March 15, 1999, the Court granted sum-

mary judgment as to liability in favor of plaintiffs on most of their claims. Specifically, the Court found defendants LOB, John Rommel, and Rommel Builders jointly and severally liable for the following violations under § 3604(f) of the FHAA: (1) insufficiently wide interior doorways inside all ground floor units in Buildings 3–12; (2) a step up into every ground floor unit in Buildings 3–12 and a step down to every balcony in the ground floor units in Buildings 3–13; (3) insufficient clearance space to maneuver on the latch side of a door with a closer in the rear ground floor units of Buildings 3–13; (4) twist doorknobs on exterior doors of all ground floor units in Buildings 3–13; (5) insufficient clearance in bathrooms in all ground floor units of Buildings 3–13; (6) unadjustable countertops in kitchens in all ground floor units of Buildings 3–13; and (7) insufficient clearance in kitchens of rear units of Buildings 3–13. *See Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.*, 40 F.Supp.2d 700, 713–14 (D.Md.1999). The Court also found defendants LOB and John Rommel jointly and severally liable for (1) a lack of handicapped parking and (2) the existence of steps in the sidewalks between the parking and Buildings 3–13. *See Baltimore Neighborhoods, Inc.*, 40 F.Supp.2d at 713–14.

On the first day of trial, plaintiffs informed the Court that they had reached a settlement agreement with defendants Rommel Builders, Inc. and John A. Rommel. Additionally, plaintiffs are not seeking liability against defendant LGGCI. Nonetheless, the Court agreed to keep LGGCI as a party because they have architectural control of the common areas and their presence is imperative in order to afford full relief. *See id.* at 712.

The remaining issues to be determined are: (1) whether Lions Gate contained an inaccessible sales center in violation of the

---

**5.** In total, BNI tested 57 developments, 44 of which BNI determined were noncompliant. As a result, BNI sued 6 developers, filed complaints against others with HUD, and instituted a education and outreach program for builders and developers (the "Homebuilders Project"). BNI subsequently applied for and received a $131,000 grant from HUD to carry out its Homebuilders Project. The grant included $31,000 for in-kind services to be provided by BNI.

ADA; (2) whether the existing walls in the bathrooms of the ground floor units of Buildings 3–12 are reinforced in accordance with the FHAA to allow the later installation of grab bars; and (3) what relief should the Court grant plaintiffs.

## II.

### A. *Sales Center*

The Court first addresses the remaining issues regarding liability. As to the sales center, plaintiffs assert that LOB violated § 12183(a)(1) of the ADA because LOB designed and constructed the Lions Gate sales center in a manner that was inaccessible to Beverly because of his disability. In response, LOB asserts that plaintiffs' ADA claim is moot because LOB closed the last model unit which temporarily served as rental sales offices and does not intend to reopen it. LOB also asserts that the model units are not required to be handicapped accessible under the ADA.

 Before the Court can proceed to plaintiffs' substantive claim, the Court must first resolve the threshold issue of mootness. "Federal courts have no jurisdiction to decide moot cases because of the case or controversy requirement of Article III of the Constitution." *Virginia ex rel. Coleman v. Califano,* 631 F.2d 324, 326 (4th Cir.1980). As the Supreme Court has explained, "no justiciable controversy is presented . . . when the parties are asking for an advisory opinion, [or] when the question sought to be adjudicated has been mooted by subsequent developments . . ." *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). A case is not moot, however, simply because the defendant voluntarily ceases the allegedly illegal conduct. *See United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). "This rule is derived from the notion that a challenged practice or policy might always evade review by being voluntarily abated during the pendency of a legal challenge thus leaving the defendant 'free to return to his old ways.'" *Knight v. Mills,* 836 F.2d 659, 670 (1st Cir.1987) (quoting *W.T. Grant,* 345 U.S. at 632–33, 73 S.Ct. 894). Concluding that such a case is moot would entitle a defendant to a dismissal as a matter of right whenever the defendant voluntarily ceased his illegal conduct prior to judgement. *See W.T. Grant,* 345 U.S. at 632, 73 S.Ct. 894. "[C]ourts have rightly refused to grant defendants such a powerful weapon against public law enforcement." *Id.* at 632, 73 S.Ct. 894. Therefore, courts place a heavy burden on defendants to demonstrate mootness in a case where there has been a voluntary cessation of allegedly illegal activity. *Id.* at 633, 73 S.Ct. 894.

To meet this burden, the defendant must demonstrate (1) "that there is no reasonable expectation that the alleged violation will recur," and (2) that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (internal quotations omitted) (citations omitted). "When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law." *Davis,* 440 U.S. at 631, 99 S.Ct. 1379.

Here, the alleged violation is the inaccessibility of the model unit that allegedly served as a sales center for Lions Gate. Defendants claim that the closure of the last model unit renders plaintiffs' claim moot. In response, plaintiffs first argue that the Court should strike LOB's evidence regarding mootness because LOB never supplemented its interrogatory answer indicating that defendant's "current model is in Bldg. 12, unit 302." LOB argues that, despite their failure to supplement their interrogatory answers, plaintiffs were provided with documents which indicated that the defendants sold the model unit. The Court finds that admission of the evidence regarding the sale of the model unit is not so unfairly prejudicial that it should be stricken.[6] Therefore, the

6. While the timing of LOB's argument may appear to unfairly surprise plaintiffs, the

Court will consider LOB's evidence regarding mootness.

■ Alternatively, plaintiffs argue that their ADA claim is not moot because LOB failed to meet the heavy burden of establishing both prongs of the *Davis* test. With respect to the first prong, plaintiffs assert that it cannot be said that there is no reasonable expectation that the alleged violation will recur because LOB still owns one unit, and other units are owned by entities affiliated with or controlled by LOB. The Court, however, finds that LOB has met its heavy burden of demonstrating that there is no reasonable expectation that the alleged violation will recur. Defendants closed the last model unit allegedly used as a sales center approximately one year before trial, when only five units remained unsold. Further, Patricia Baldwin testified that LOB does not contemplate reopening the sales center to sell the remaining unsold unit or any other unit. The Court finds her testimony credible in this regard. Accordingly, the Court finds that LOB satisfied the first prong of the *Davis* test.

The second prong of the *Davis* test requires the defendant to prove that the "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631, 99 S.Ct. 1379 (internal quotations omitted) (citations omitted). Plaintiffs argue the LOB has failed to meet this prong because nothing has ever redressed the denial of Beverly's right to have access to the sales center. LOB responds by asserting that there are no lingering effects of the alleged violation, and that redressing Beverly's right to access the model unit is irrelevant because he is not entitled to

damages under the ADA and injunctive relief is no longer appropriate.

Implicit in the second prong of the *Davis* test is the requirement that the relief demanded will actually cure the lingering effects of the alleged violation. *See Penthouse Int., Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C.Cir.1991). "The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff." Rhodes v. Stewart*, 488 U.S. 1, 4, 109 S.Ct. 202, 102 L.Ed.2d 1 (1988) (citation omitted) (emphasis in original). Here, plaintiffs only seek declaratory relief. The Court fails to see how granting plaintiffs' request will cure any harm suffered by plaintiffs. In certain cases, declaratory relief alone can provide relief. *See, e.g., Doe v. U.S. Air Force*, 812 F.2d 738, 740 (D.C.Cir.1987) (holding that declaratory judgement would constitute relief where the government would respond to the declaration by returning seized materials). In this case, however, a declaration that defendant's sales center violated the ADA would have no effect on the defendant because the sales center is closed and will not be reopened. Plaintiffs' claim could also be saved if Congress chose to permit private plaintiffs to recover damages or civil penalties for violations of the ADA. *See, e.g., Atl. States Legal Found. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1134–35 (11th Cir. 1990) (holding that the civil penalty provision kept plaintiff's Clean Water Act claim alive despite voluntary cessation of alleged illegal conduct). Congress, however, only provided for injunctive relief. *See* 42 U.S.C. § 12188. Consequently, the requested declaratory judgment would only serve as an advisory opinion. The Court, therefore, lacks jurisdiction to hear plaintiffs' ADA claim.[7]

Court notes that pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure lack of subject matter jurisdiction can be raised at any time, including trial.

**7.** The Court suspects that the main reason, if not the only reason, for plaintiffs' ADA claim is to permit the recovery of attorneys' fees. However, "a claim for attorneys' fees is gen-

erally not sufficient to save a case from being moot." *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 n. 2 (8th Cir. 1994) (citation omitted). Moreover, plaintiffs would not likely be entitled to attorneys' fees for their declaratory judgment claim because a party is only a prevailing party for the purpose of attorneys' fees if the declaratory judgment affects the behavior of the defen-

### B. Reinforced Bathroom Walls

■ The remaining issue regarding liability is whether the existing walls in the bathrooms of the ground floor units of Buildings 3–12 are reinforced to allow later installation of grab bars in accordance with the FHAA, 42 U.S.C. § 3604(f)(3)(C), (iii)(III). Plaintiffs argue that the evidence clearly and unequivocally demonstrates that the bathroom walls lack the required reinforcement. At trial, Frederick Melby, plaintiffs' architectural expert, testified that the architectural plans for Lions Gate do not contain any plans for reinforced walls. Rommel testified that the buildings were built strictly according to plans, and that no reinforcements were placed in the walls other than indicated in the plans. In response, LOB asserts that the existing walls contain three types of reinforcement sufficient to permit the later installation of grab bars.

First, LOB asserts that grab bars could be installed on the existing studs in the bathroom walls. The Court, however, agrees with Melby that the studs do not constitute reinforcement within the meaning of § 3604. When specifically asked about installing the grab bars on the existing studs, Melby testified that the chance of hitting the stud at both ends was "nonexistent." He further testified that proper reinforcement would consist of a piece of plywood or a solid board. Based on this evidence, the Court finds that the existing studs do not provide sufficient reinforcement.

Second, LOB asserts that the two layers of sheetrock currently in the bathroom walls is sufficient to support the installation of grab bars. However, plaintiffs' experts disagreed with LOB's assertion, testifying that sheetrock would not provide sufficient reinforcement. The Court finds this uncontroverted testimony credible. Accordingly, LOB's second argument must also fail.

Finally, LOB asserts that grab bars can be installed on the existing "banjo" vanities. According to Melby, however, a grab bar is typically installed 36 inches above the floor, and the "banjo" vanities are only 30 inches above the floor. Additionally, Ralph Miller, a tenant in Building 13, testified that the "banjo" vanity in his bathroom was not sturdy and that it moved up and down when touched. Paul Black, plaintiffs expert in cost estimation and construction management, testified that he has never seen grab bars affixed to "banjo" units, nor would he ever affix grab bars to "banjo" units because they are usually the wrong height and not strong enough. Based on this uncontroverted evidence, the Court finds that "banjo" vanities do not constitute reinforcement within the meaning of § 3604.

After reviewing all of the evidence, the Court is satisfied that the existing bathroom walls do not contain reinforcement to allow the later installation of grab bars. Accordingly, the Court finds defendant LOB liable in this regard.

### III.

In light of these findings, the Court turns to the issue of relief. Plaintiffs seek monetary damages, equitable relief, and attorneys' fees and costs.[8]

### A. Damages

■ The FHAA permits private plaintiffs to recover actual damages if the court finds that a discriminatory practice has occurred. See 42 U.S.C. § 3613(c)(1). Plaintiff Beverly seeks damages in the amount of $34,000 to compensate him for the humiliation that he suffered as a result of defendant's discriminatory practices. This amount equals 1 percent of the average sales price for each of the 40 noncompliant units in Buildings 3–12. In response, LOB asserts that Beverly should

dant. See Rhodes v. Stewart, 488 U.S. 1, 3–4, 109 S.Ct. 202, 102 L.Ed.2d 1 (1988). As discussed above, the declaration in this case would not affect the defendant's behavior.

8. In accordance with Local Rule 109, the Court will address the issue of attorney's fees and costs following the entry of judgment.

only receive nominal damages in the amount of one dollar.

■ Emotional damages are recoverable under the FHAA for "distress which exceeds the normal transient and trivial aggravation attendant to securing suitable housing." *Morgan v. Secretary of Hous. & Urban Dev.*, 985 F.2d 1451, 1459 (10th Cir.1993). In this case, the only evidence of emotional distress comes from Beverly himself. In such cases, the Fourth Circuit has held that "the testimony must establish that the plaintiff suffered demonstrable emotional distress; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a [civil rights] violation occurred supports an award of compensatory damages." *Price v. Charlotte*, 93 F.3d 1241, 1254 (4th Cir. 1996). In other words, a " 'genuine injury' is necessary." *Price*, 93 F.3d at 1254 (quoting *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)).

■ Here, the evidence of emotional distress consisted of Beverly's testimony that he felt humiliated because the sales representative did not appear to be interested in selling him a unit. According to Beverly, the sales representative was "uncaring" about him as a person and made him feel that she was not interested in him. Further, the Court is mindful that Beverly visited Lions Gate as a tester for BNI, which had a policy to inform testers that they might encounter noncompliant housing. This was also not Beverly's first time serving as a tester. Beverly had previously served as a housing tester for BNI eight to ten times. Additionally, he had conducted restaurant accessibility surveys.

After reviewing all the evidence, the Court finds that at most Beverly's testimony consisted of mere conclusory statements, and that he has failed to make the required showing of demonstrable emotional distress. *See Price*, 93 F.3d at 1251 (seriatim recitations of "depression" and "hurt feelings" are insufficient to support award for emotional damages). Because Beverly failed to show actual injury, he is only entitled to nominal damages. *See id.* at 1250. Accordingly, the Court will award Beverly damages of one dollar.

By its decision, the Court in no way intends to minimize the seriousness of disability-based discrimination. Discriminatory practices, such as those employed by LOB, can clearly cause emotional harm. Nonetheless, such harm cannot be assumed. To award Beverly damages for emotional harm, the Court would have to assume that Beverly suffered humiliation, since he failed to meet his burden of showing demonstrable emotional distress. It is for this reason that his claim for damages over and above nominal damages fails.

Plaintiff BNI also seeks monetary damages. First, BNI seeks damages in the amount of $381.00 for the cost of testing Lions Gate. LOB does not dispute this request. Accordingly, the Court will award BNI damages in this regard.

■ Additionally, BNI seeks $2,977.27 in diversion of resources damages for the cost borne by BNI to conduct its Homebuilders Project, which seeks to combat the effects of discrimination by educating builders about the fair housing laws. This sum represents 1/44th of the $131,000 cost of the Homebuilders Project. Plaintiffs used this figure because Lions Gate was 1 of 44 developments surveyed by BNI shown to have violated the FHAA. In response, LOB asserts that the *pro rata* share for the Homebuilders Project is not recoverable because it is not a resource that BNI diverted in order to bring its claim against LOB. Rather, LOB asserts that the program furthered BNI's corporate mission to educate the public about the fair housing laws. Additionally, LOB points out that BNI received a $100,000 grant from the federal government to implement the program.

The Supreme Court has held that the drain on an organization's interests necessary to "identify and counteract" discriminatory housing practices is a concrete and demonstrable injury that is sufficient to

confer standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). It follows, therefore, "that if the [plaintiff] is able to establish this injury at trial, it may collect for it." *United States v. Balistrieri*, 981 F.2d 916, 933 (7th Cir.1992). Using this rationale, courts have permitted plaintiffs to recover such costs as the costs for training seminars that would be performed in the future, and the expected costs to monitor and audit the defendant. *See Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1099 (7th Cir.1992); *see also Balistrieri*, 981 F.2d at 933 (awarding plaintiffs for time and money diverted from counseling to pay for legal efforts directed at discrimination).

Here, BNI is seeking to recover a portion of the money it spent on the Homebuilders Project. Dyer testified that BNI implemented the program to educate area builders about housing discrimination after BNI's testing program revealed that 44 area housing developments violated the fair housing laws. Dyer also testified that BNI could have used the funds elsewhere if they had not been used on the Homebuilders Project. Because Lions Gate was one of the noncompliant developments, the Court finds that BNI suffered a concrete and demonstrable injury when it diverted resources to the Homebuilders Project to counteract the defendant's discriminatory practices. The Court further finds that the $2,977.27 requested by BNI is a fair estimation of the portion of BNI's injury caused by LOB.[9] Accordingly, the Court will award BNI $2,977.27 in diversion of resources damages.

**B. *Equitable Relief***

The remaining category of relief that plaintiffs seek is equitable relief. More specifically, plaintiffs seek an order requiring defendant LOB to deposit sufficient funds in the registry of the Court to permit the necessary retrofitting of the common areas and the interiors of the 40 noncompliant units in Buildings 3–12. Additionally, plaintiffs seek an order requiring defendant LGGCI to permit the retrofitting of the common areas as well as the interiors of individual units if desired by the individual unit owners. In response, defendants assert that plaintiffs are not entitled to relief in the form of retrofitting. Alternatively, if the Court finds that retrofitting is an appropriate remedy, the defendants assert that the specific relief requested by plaintiffs is excessive.

**1. *Availability of Retrofitting as Affirmative Action Relief***

"In fashioning equitable relief for the violation of the Fair Housing Act, trial courts ... are guided by its underlying purposes." *Smith v. Clarkton*, 682 F.2d 1055, 1068 (4th Cir.1982) (citations omitted). The declared purpose of the Fair Housing Act is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The Fair Housing Amendments Act, which extended the protection of the federal fair housing laws to persons with disabilities, "is worded as a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individ-

**9.** The Court rejects LOB's argument made during closing argument that BNI should receive only a *pro rata* share of the $31,000 for in-kind services performed by BNI, but not a *pro rata* share of the federal grant. The common law collateral source rule provides that a tort award should not be offset by compensation that a plaintiff receives from another source. *See United States v. Price*, 288 F.2d 448, 449–50 (4th Cir.1961). "A damages action under the [FHA] sounds basically in tort." *Curtis v. Loether*, 415 U.S. 189, 195, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). Further, other courts have applied the collateral source rule in federal discrimination cases. *See e.g. Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1171 (6th Cir.1996) (applying collateral source rule in Title VII case). Therefore, the Court finds that the collateral source rule applies to FHA cases. The Court further finds that the grant to BNI is collateral and not double compensation. The grant was not awarded to compensate BNI for the costs it incurred counteracting defendant's discriminatory practices. While BNI used the grant for that purpose, it could have been used for another purpose. Consequently, the Court will not offset BNI's award.

uals." *Bronk v. Ineichen,* 54 F.3d 425, 428 (7th Cir.1995). The accessability provisions of the Fair Housing Amendments Act, which LOB violated in this case, are essential to carrying out this mandate. As the legislative history makes clear:

> A person using a wheelchair is just as effectively excluded from the opportunity to live in a particular dwelling by the lack of access into a unit and by too narrow doorways as a posted sign saying "No Handicapped People Allowed."

H.R.Rep. No. 711 at 25, *reprinted in* U.S.C.A.N. at 2186.

■ When such "federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (citations omitted) (internal quotations omitted). With respect to civil rights violations, "necessary relief" means that the "court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle,* 422 U.S. at 418, 95 S.Ct. 2362 (citations omitted) (internal quotations omitted). To this end, courts have generously construed the language of the Fair Housing Act to ensure the prompt and effective elimination of housing discrimination. *See Park View Heights Corp., v. Black Jack,* 605 F.2d 1033, 1036 (8th Cir.1979). "Generally, and particularly in a fair housing situation, the existence of a federal statutory right implies the existence of all measures necessary and appropriate to protect federal rights and implement federal policies." *Metro. Hous. Dev. Corp. v. Arlington Heights,* 616 F.2d 1006, 1011 (7th Cir.1980) (citation omitted).

■ In a civil Fair Housing Act case brought by a private person, the court's equitable powers include the power to order such affirmative action as may be appropriate. 42 U.S.C. § 3613(c)(1). "Affirmative action promptly operates to change the outward and visible signs of yesterday's [discriminatory] distinctions and thus, to provide an impetus to the process of dismantling the barriers, psychological or otherwise, erected by past practices." *Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC,* 478 U.S. 421, 450, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (internal quotation omitted). Affirmative injunctive relief for past discriminatory practices, such as the relief requested by plaintiffs, "is appropriate where the trial court believes that the vestiges of prior discrimination linger and remain to be eliminated." *United States v. DiMucci,* 879 F.2d 1488, 1498 (7th Cir.1989) (citations omitted) (internal quotations omitted).

Here, defendants argue that plaintiffs are not entitled to affirmative action relief in the form of retrofitting or a retrofitting fund. According to the defendants, retrofitting will not redress any harm suffered by the plaintiffs because neither Beverly nor any member of BNI is seeking handicapped accessible housing in Lions Gate or elsewhere in the Odenton area. Defendants further argue that BNI is not entitled to relief because it is not a person who has been discriminated against within the meaning of § 3604(f), and that an organization like BNI only has standing to recover for their own injuries, and not for the injuries of the community at large. In response, BNI argues that it has standing to seek affirmative action relief in the form of retrofitting. BNI asserts that it is acting as a "private attorney general" and is entitled to relief because it is an "aggrieved person" within the meaning of the statute regardless of whether any plaintiff is seeking handicapped accessible housing in Lions Gate or elsewhere in the Odenton area.

■ The Court finds the BNI is an "aggrieved person" within the meaning of 42 U.S.C. § 3613. Under § 3602(i), an "aggrieved person" includes "any person who claims to have been injured by a discriminatory housing practice." BNI

falls within this definition because it has been injured by LOB's numerous violations under § 3604. *See* § 3602(f). Consequently, BNI is entitled to bring an action for "appropriate relief," including affirmative action relief. § 3613(c)(1).

■ The Court further finds that affirmative action relief in the form of retrofitting or a retrofitting fund is an appropriate remedy in this case. Without such relief, the vestiges of LOB's discrimination will linger and remain to be eliminated. As Dyer testified, BNI's mission is to provide equal housing opportunities, including housing for disabled persons. The Court has already awarded BNI damages for injuries resulting from the diversion of resources to the Homebuilders Project. BNI may have prevented future discrimination through its Homebuilders Project. Nonetheless, compensating BNI for the diversion of resources does nothing to compensate for the loss of accessible housing. Consequently, as BNI continues to provide equal housing opportunities, it must also continue to compensate for the lack of housing caused by the LOB's failure to make Lions Gate handicapped accessible.

It is in this regard that disability-based discrimination is different from other forms of discrimination. For example, if a person is denied access to housing on the basis of race, the past discriminatory practices can be eradicated by dismantling the psychological barriers of discrimination. When discrimination is disability-based, however, physical barriers can remain even after any psychological barriers have been dismantled. Here, the Homebuilders Project undoubtedly helped to dismantle the psychological barriers by educating builders about the accessability requirements of disabled persons. But until the physical barriers are removed, the "No Handicapped People Allowed" sign remains. In this case, the Court finds that retrofitting, or the establishment of a retrofitting fund, is an appropriate way to remove the physical barriers created by LOB's discriminatory practices.[10]

The fact that retrofitting would benefit the community at large in addition to providing relief to the plaintiffs is consistent with plaintiffs' status as "private attorneys general." The use of the "any person" language in § 3602(i) indicates a congressional intent to "encourage enforcement by so-called 'private attorneys general.'" *Bennett v. Spear*, 520 U.S. 154, 165–66, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Status as private attorneys general permits plaintiffs to vindicate the public interest. *See Spann v. Colonial Village, Inc.*, 899 F.2d 24, 30–31 (D.C.Cir.1990); *see also Thomas v. Washington County Sch. Bd.*, 915 F.2d 922, 925 (4th Cir.1990) (stating that remedies in a civil rights case are devised to vindicate the policies of the Act, not merely to afford private relief to the employee).

---

**10.** The Court's determination that retrofitting is an appropriate affirmative action remedy for noncompliance with the accessability provisions of the FHAA is supported by the decision in *HUD v. Perland*, 1998 WL 142159 (HUDALJ 05–96–1517–8, Mar. 30, 1998). In *Perland*, an administrative law judge ordered the retrofitting of a condominium development that violated the accessability requirements of § 3604. Courts have also ordered retrofitting for noncompliance with the accessability requirements of the ADA. *See Coalition of Montanans Concerned with Disabilities, Inc. v. Gallatin Airport Auth.*, 957 F.Supp. 1166, 1171 (D.Mont.1997) (enjoining defendants to redesign and construct an airport terminal to bring it into compliance with the ADA); *Deck v. Toledo*, 29 F.Supp.2d 431 (N.D.Ohio 1998) (granting preliminary injunction requiring curb ramp modifications necessary to bring them into compliance with the ADA); *Lieber v. Macy's West, Inc.*, 80 F.Supp.2d 1065, 1081 (N.D.Cal. 1999) (ordering defendants to retrofit non-compliant areas of a department store including entrances, counters, fitting rooms, and restrooms); *Lara v. Cinemark USA, Inc.*, No. EP–97–CA–502–H, 1999 WL 305108, at *2 (W.D.Tex.1999) (ordering defendants to retrofit all 18 non-compliant theaters to provide patrons in wheelchairs with lines of sight comparable to able-bodied patrons); *Ramirez v. Dist. of Columbia*, No. 99–803, 1999 WL 986914, U.S.Dist. LEXIS 15964, at 16 (D.D.C. Oct. 14, 1999) (granting preliminary injunction which requires defendants to provide handicap-accessible bathroom and barrier-free access to mobility-impaired elementary school student).

Consequently, the requested relief generally will benefit not only the claimant but all other persons subject to the discriminatory practice regardless of whether the claimant proceeds as an individual or in a class action. *Thomas*, 915 F.2d at 925–26.

### 2. *Specific Relief Requested by Plaintiffs*

██ Having determined that the type of affirmative action relief requested by plaintiffs is appropriate, the Court will now determine whether the specific relief requested by plaintiffs is appropriate under the facts of this case. When fashioning a remedy for a civil rights violation, courts will be guided by general principles of equity. *Milliken v. Bradley*, 433 U.S. 267, 279–80, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). As Chief Justice Burger stated in *Lemon v. Kurtzman*:

> [E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable. 'Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.' *Brown v. Bd. of Educ.*, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973). The principal limitation on the court's equitable powers is that the relief should be no broader and no more burdensome than necessary to provide complete relief to the plaintiff. *See Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 766 (4th Cir.1998).

### a. *Retrofitting the Common Areas*

First, plaintiffs seek an order requiring LOB, to deposit $144,948.47 in the registry of the Court to retrofit the common areas of Buildings 3–12. In addition to the estimated cost of retrofitting the common areas, this sum also includes an additional 10% to cover the cost of project management. Defendants respond by arguing that the amount sought by plaintiffs is highly excessive. As an alternative, LOB suggests retrofitting only Buildings 5–9, which it argues would be significantly less disruptive and less expensive. LGGCI, on the other hand, argues that the inconvenience and disruption to unit owners far outweighs the speculative possibility that retrofitting the common areas will increase handicapped accessible housing.

As an initial matter, the Court accepts the uncontroverted testimony of Paul Black, plaintiffs' expert in cost estimation and construction management. Black's expert report includes the estimated cost to retrofit the common areas and interiors of units at Lions Gate to bring them into compliance with the FHAA. The Court accepts these figures as accurate, subject to the modifications that Black and Melby made at trial.[11]

To determine whether plaintiffs' proposed retrofitting of the common areas is equitable, the Court must consider the interests of the unit owners and residents of Lions Gate, and how their interests will be affected by plaintiffs' proposal. The general concerns of the residents were summed up by two Lions Gate residents who testified at trial. The residents expressed concern that the proposed retrofitting would cause inconvenience in access, would interfere with privacy, and that the noise would interfere with work and sleep. They also described Lions Gate as a grow-

---

**11.** The Court accepts Black's report subject to the following exceptions. First, Black's report contemplates replacing the existing mailboxes with new ones. During cross examination, however, Melby testified that the mailboxes could be brought into compliance by simply attaching a wooden rod on both sides of the mailbox that would extend from the mailbox to the floor. Second, the report contemplates installing grab bars in the bathrooms, which Black testified would not be required under the FHAA; only reinforcements in bathroom walls are included in estimating these costs. Third, Black testified that Buildings 10 and 12 would require handrails, which will cost approximately $540 per building. Fourth, the report contemplates retrofitting the interiors of all 44 noncompliant units. Plaintiffs, however, are only seeking an order requiring LOB to pay the cost of retrofitting the 40 noncompliant units in Buildings 3–12.

ing and maturing community, and feared that the installation of ramps and destruction of trees and shrubs would have an disruptive effect on the community.

To determine whether the residents' concerns are justified and whether they outweigh plaintiffs' interest in providing accessible housing at Lions Gate, the Court must consider the details of plaintiffs' proposed plan. With respect to retrofitting the common areas, plaintiffs' experts testified about the work that must be done to eliminate the six-inch step up that currently exists between the foyers and the doorways to the individual units in Buildings 3–12. To bring the foyers into compliance, additional concrete would have to be poured on top of the existing foyer floor. According to plaintiffs' experts, this process would require excavating the area around the existing drains with a jackhammer; raising the drains; cutting off the first tread of the staircase; removing the molding from the base of the walls; preparing the existing concrete with a bonding agent and reinforced wire; installing expansion joints; and then pouring approximately six inches of concrete. Access to the building would be denied for approximately ten hours while the concrete set. According to Black, however, the concrete could be poured in stages, and plywood could be placed on top of the wet concrete to permit continued access to the building. Regardless, residents could always walk across the wet concrete in the event of an emergency.

In addition to raising the foyers, ramps must also be installed in Buildings 3–12. The cost and inconvenience involved, however, vary from building to building. Beginning with Buildings 5–9, the parties appear to agree that the retrofitting of these buildings will create the least disruption to unit owners and residents and cost the least. Each of these buildings has entrance walks that are currently level with the foyers or have one or two steps leading down from the sidewalk to the foyer. Therefore, the concrete could be poured on top of the existing walkway without having to demolish it. In some instances, however, the sidewalk in front of the building would have to be demolished with a jackhammer.

After carefully considering plaintiffs' proposed retrofitting, the Court finds that the benefit to plaintiffs substantially outweighs the inconvenience to the residents. Accordingly, the Court will grant plaintiffs' request with respect to retrofitting the common areas of Buildings 5–9. In doing so, the Court also rejects LGGCI's argument that retrofitting the common areas is an "exercise in futility" because the Court cannot order individual units to be retrofitted. As plaintiffs aptly point out, unless the common areas are retrofitted, no unit at Lions Gate will ever be made accessible.

The Court reaches the same conclusion with respect to Buildings 10 and 12. Similar to Buildings 5–9, the proposed ramps for Buildings 10 and 12 would run straight into the buildings from the sidewalk. To install the ramps, however, the steps leading up to the buildings would have to be demolished. The ramps would extend from the sidewalk all the way to the entrance to Unit 103 in each building and would also require the installation of handrails. The demolition of the steps will undoubtedly increase the noise and inconvenience to residents. Nonetheless, the additional disruption would not be so great as to foreclose retrofitting as a remedy. Accordingly, the Court will grant plaintiffs' request with respect to Buildings 10 and 12 as well.

Retrofitting the common areas of the remaining buildings, Buildings 3, 4, and 11, would be the most disruptive and costly. Each of these buildings would require the installation of a bi-directional ramp running parallel to the building. Installation of these ramps would require the destruction of a significant portion of the trees and shrubbery in front of the buildings. Because of the limited space between the sidewalk and the buildings, the ramps would also pass within inches of the front window of Unit 104 in each of the buildings. The Court finds that this could sig-

nificantly interfere with the privacy of the occupants of these three units.

Additionally, there are timber retaining walls located in front of Buildings 3 and 4 between the sidewalks and the front of the buildings. The proposed ramps would take up the majority of the space between the retaining walls and the buildings. A portion of these retaining walls surround a concrete encased manhole cover that protrudes out from the retaining wall toward the building. This manhole further limits the amount of space between the proposed ramp and the retaining walls. The Court finds that this lack of space could interfere with maintenance, including preventing access to the front of the retaining walls and the sewer cleanout in front of Building 3. Building 3 also has a second manhole cover located in the front of the building that is directly in the path of the proposed ramp.

Based on this evidence, the Court finds that the installation of bi-directional ramps for Buildings 3, 4, and 11 would cause significant disruption to the residents of Lions Gate. The Court further finds that the ramps would materially alter the aesthetics of the development, interfere with the maintenance of the buildings, and invade the privacy of each tenant who occupies Unit 104. As such, the burden imposed by the requested relief outweighs the desirability of providing the retrofitting sought by the plaintiffs.

In sum, the Court finds that the proposed retrofitting of the common areas of Buildings 5–10, and 12 is an appropriate remedy. The proposed retrofitting of the common areas of Buildings 3, 4, and 11, however, would impose too great a burden on the unit owners of Lions Gate. Accordingly, the Court will order LOB to deposit $49,858.53 [12] in the registry of the Court to fund the retrofitting of the common areas of Buildings 5–10 and 12.

b. *Retrofitting the Interiors*

Second, plaintiffs seek an order requiring LOB to deposit $325,107.75 [13] in the registry of the Court to fund the interior retrofitting of the 40 noncompliant ground floor units in Buildings 3–12.[14] The ground floor unit owners could then use the fund to voluntarily retrofit their condominiums. Because retrofitting individual units would be voluntary, the Court finds that the balance of the equities weigh in favor of plaintiffs. Accordingly, the Court will order LOB to deposit $178,886.75 in the registry of the Court to fund the interior retrofitting of the noncompliant units in Buildings 5–10, 12, and 13.[15]

To encourage unit owners to retrofit, plaintiffs also seek to compensate unit owners $1,000 per unit. Notwithstanding the fact that the retrofitting is voluntary, the Court finds that the construction will undoubtedly inconvenience the owners who

12. The figure represents Black's estimated cost to retrofit the common areas, plus the cost to install handrails for Buildings 10 and 12, less the costs to install new mailboxes, and less the costs to raise the foyers and install ramps for Buildings 3, 4, and 11.

13. This amount includes an additional 10% to cover the cost of project management.

14. LOB presented evidence that compliance under the requirements of the FHAA in regard to reinforcements in bathroom walls to allow later installation of grab bars could be accomplished by the installation of a piece of marine grade finished wood on the wall of the bathroom over the tub to which a grab bar could be attached at a later date. The evidence reflected that this retrofitting could be accomplished at a cost of $20 per bathroom.

The Court rejects this proposal as a violation of both the letter and the spirit of the FHAA, and accordingly, no adjustment is made to the cost estimate in Black's expert opinion in this regard.

15. Because plaintiffs based their calculations on the cost of retrofitting only 40 of the 44 noncompliant units, the Court will grant relief accordingly. Nonetheless, the Court directs that the funds should be made available to retrofit any noncompliant unit, including the 4 units in Building 13. Further, because the goal of retrofitting is to increase the stock of handicapped accessible housing, the Court will not permit unit owners to use the funds to partially retrofit their units. Rather, unit owners must agree to retrofit their units so as to comply fully with the accessability requirements of the FHAA.

volunteer to have their units retrofitted. The Court fears that this may discourage unit owners from volunteering, thereby rendering the remedy ineffective at increasing the stock of handicapped accessible housing at Lions Gate. Therefore, the Court orders LOB to deposit $96,000 in the Registry of the Court to pay an incentive payment of $3,000 to each unit owner who chooses to have their interior retrofitted. While the plaintiffs have only requested incentive payments of $1,000 per unit, the Court has determined that a greater amount is required to accomplish the necessary encouragement. Additionally, the Court orders LOB to deposit $8,400 in the Registry of the Court to reimburse any of the 84 unit owners in Buildings 5–10 and 12 who vacate their units during retrofitting up to $100 per unit for hotel costs.

The Court recognizes that the equitable relief thus far only compensates plaintiffs for the loss of the 28 noncompliant units in Buildings 5–10 and 12. The Court acknowledges that it has a "duty to render a decree which will so far as possible eliminate the discriminatory effects of the past." *Albemarle*, 422 U.S. at 418, 95 S.Ct. 2362. However, in light of the incentive payments referred to above, the Court is satisfied that, in the exercise of its equitable powers, it has in large measure addressed the elimination of the discriminatory effects of the past. The allocation of funds to the incentive payments is more likely to accomplish this purpose at Lions Gate than any other contemplated expenditure. Accordingly, the Court will not order LOB to make any additional payments in regard to the remaining noncompliant units in Buildings 3, 4, and 11.

c. *Reversion of Any Remaining Funds*

The funds for retrofitting the common areas and the interiors shall remain in the registry of the Court for a period of three years from the date that the fund is established. If funds remain in the registry at the end of three years, the parties disagree about to whom the remaining funds should revert. Plaintiffs assert that the purposes of the FHAA would best be served if the remaining funds reverted to BNI. BNI also raises the possibility of giving the funds to a third party involved in providing fair housing opportunities. According to BNI, the least tenable option is to give the money to the LOB because it would reward them for breaking the law. LOB, by contrast, asserts that any remaining funds should revert to LOB. LOB argues that if the remaining funds revert to BNI, it would be tantamount to a penalty because it would not compensate the plaintiffs for any harm.

The Court's decision regarding whether to direct that remaining funds revert to BNI, LOB, or a third party will be guided by equitable principles and the purposes of the FHAA. At the suggestion of the parties, however, the Court has agreed to reserve judgment on this issue until a later date. Nevertheless, the Court finds it appropriate to determine at this time that any part of the funds remaining in the registry of the Court earmarked for either the incentive payments or the hotel cost allowance shall revert to LOB. These allocations have been made by the Court as a judicial technique to accomplish the purposes previously discussed, and in the event that they are not expended for such purposes, they should not be expended for any other purpose.

d. *Order Requiring LGGCI to Permit Retrofitting*

█ Next, Plaintiffs seek an order requiring LGGCI to permit retrofitting of the common areas and the interiors if so desired by the unit owners. In response, LGGCI argues that the Court may not order LGGCI to permit retrofitting because it did not violate the law and the proposed retrofitting would be extensive and highly invasive. Plaintiffs, however, argue, as the Court has previously ruled, that the Court can impose an equitable decree upon LGGCI even though it did not violate the law. According to plaintiffs, the temporary and occasional inconvenience to the residents of Lions Gate is not

a sufficient reason to allow Lions Gate to remain inaccessible in perpetuity.

 The Court recognizes that a fundamental limitation on its remedial powers is that "[t]hose powers can be exercised only on the basis of a violation of the law." *Gen. Bldg. Contractors Assoc. v. Pennsylvania*, 458 U.S. 375, 399, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (citation omitted). Notwithstanding, the Court may retain in a case a party which has not committed any violations of the law and even subject it "to such minor and ancillary provisions of an injunctive order as the District Court might find necessary to grant complete relief to [the plaintiffs]." *Gen. Bldg. Contractors*, 458 U.S. at 399, 102 S.Ct. 3141.

LGGCI asserts that the burdens imposed by the relief requested in this case are direct, significant, and more than incidental. In support of their argument, LGGCI cites *General Building Contractors Assoc. v. Pennsylvania*, 458 U.S. 375, 399, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). In *General Building Contractors*, the district court imposed minority hiring quotas on nonliable employers and associations, and ordered these nonliable parties to pay a share of the enforcement costs, which were estimated to be $200,000 in the first year alone. 458 U.S. at 399–400, 102 S.Ct. 3141. The Supreme Court, however, held that the district court could not subject these nonliable parties to such relief because it could not be regarded as "minor" or "ancillary." *Id.*, at 399–400, 102 S.Ct. 3141.

The Court disagrees with LGGCIs' contention that the proposed relief in this case is not "minor" or "ancillary" under the standard set forth in *General Building Contractors*. Here, LGGCI would not be ordered to share in the costs of the retrofitting. Nor would LGGCI be asked to take an active role in the retrofitting process, although BNI has indicated a desire to complete the work in close consultation with LGGCI. All LGGCI would be ordered to do is to permit the retrofitting to occur. At the summary judgment stage,

LGGCI conceded that it had the authority to permit retrofitting, the reason the Court retained LGGCI as a party. Further, the retrofitting will cause relatively minor inconvenience to the residents and it is not wholly inconsistent with work that is commonly done in community developments such as Lions Gate. According to plaintiffs' experts, the retrofitting can be done in a safe and efficient manner so as to minimize the disruption. As one of the current residents testified, such careful planning previously helped to minimize inconvenience when work was done on the foyers. Moreover, the construction contemplated in this case is not drastically different from construction to which LGGCI voluntarily agreed to undergo as part of a prior lawsuit. Among other things, that construction included the removal of concrete by use of a jackhammer. Based on this evidence, the Court finds that a proposed order requiring LGGCI to permit retrofitting is both minor and ancillary.

The Court further finds that ordering LGGCI to permit the retrofitting is necessary to grant complete relief to the plaintiffs. LGGCI, however, asserts that the Court should order alternative remedial measures. For example, LGGCI argues that the Court could order LOB to procure voluntary agreements with the unit owners and with LGGCI itself, such as the administrative law judge ordered in *HUD v. Perland*, 1998 WL 142159 (HUDALJ 05–96–1517–8, Mar. 30, 1998). In *Perland*, the administrative law judge ordered defendants to attempt to obtain permission to retrofit units that the defendants had already sold and to vote favorably on an association resolution to retrofit the common areas. 1998 WL 142159, at *12 n. 47. Notably, however, that order appears to have been analogous with an order requiring defendants to permit the retrofitting. More specifically, it appears that the order requiring the defendants to vote in favor of retrofitting would have been decisive because the defendants owned 16 of the 24 units; the defendants were enjoined from selling more units until the retrofitting was

complete; and the defendants had to give an incentive payment to the owner of the only ground-floor unit that had been sold. *Perland,* 1998 WL 142159, at \*3, 12 n. 47. Here, such a remedy would be ineffective because LOB only owns one unit, and LGGCI has already expressed its opposition to retrofitting.

Another alternative suggested by LGGCI is only to establish a retrofitting fund to make other dwellings in Anne Arundel County handicapped accessible. The Court agrees that making other dwellings in Anne Arundel County handicapped accessible furthers the purposes of the FHAA. Nonetheless, the Court finds that the purposes of the FHAA are best served in this case if the units at Lions Gate are made handicapped accessible to the extent that doing so does not impose too great a burden on the unit owners and residents. The Court has already determined that portions of plaintiffs' proposed retrofitting of Lions Gate are appropriate. Consideration of any program to make other dwellings in Anne Arundel County handicapped accessible can be addressed at a later date if the incentive program does not accomplish material retrofitting at Lions Gate. Therefore, the Court will order LGGCI to permit the retrofitting of the common areas and the interiors of units if so desired by the unit owners.

### e. *Appointment of a Special Master*

▉ To oversee the retrofitting, Plaintiffs seek the appointment of a special master. Plaintiffs recommend that the special master should be a person in the construction and project management field, and the special master's duties should include: administering the retrofitting fund; coordinating with LGGCI, residents and contractors; obtaining necessary permits; soliciting bids; awarding contracts; supervising the work; and authorizing payments.

The use of special masters to administer relief in fair housing cases is an accepted practice. *See, e.g., United States v. Yonkers Bd. of Educ.,* 29 F.3d 40, 44 (2d Cir. 1994) (upholding use of special master to administer desegregation program). Nonetheless, Rule 53(b) of the Federal Rule of Civil Procedure provides that "reference to a master shall be the exception and not the rule ... [I]n actions to be tried without a jury ... a reference shall be made only upon a showing that some exceptional condition requires it." The remedial stage of this case provides such an exceptional condition. The implementation of the Court's remedial order may well involve a lengthy process, which will require detailed planning, frequent decision making, and an understanding of construction management. The Court feels that a special master would be much more qualified to perform these duties and a better use of judicial resources.

Although the Court has decided to appoint a special master, the Court reserves detailing the specific duties to be performed by the special master until such time as the Court is prepared to make an order of reference. The Court will also determine the amount of compensation to be paid to the special master at a later date. Whatever the amount, LOB shall bear the cost of compensating the special master, and this amount shall be exclusive of any amount LOB is already required to pay for retrofitting.[16] In the event that LOB does not fulfill its responsibilities in this regard, other funds in the Registry of the Court will be made available upon further order of the Court.

The parties have also asked the Court to retain jurisdiction until the retrofitting is complete. The Court will grant the parties' request in this regard and retain jurisdiction over the case to consider appeals from adverse decisions of the special mas-

---

**16.** Since it is contemplated that the special master will perform the duties of construction management, it will not be necessary for the Court to address plaintiffs' request that an additional 10% be included in the estimated cost of retrofitting to cover the cost of construction management.

ter and to modify the Court's order as necessary.

## IV.

■ The remaining issue to be resolved is the effect of the Settlement Agreement between plaintiffs and defendants John A. Rommel and Rommel Builders, Inc. In the Settlement Agreement, plaintiffs release Rommel and Rommel Builders from all claims in consideration for payment in the amount of $240,000. Paragraph 3 of the Settlement Agreement is a Joint Tortfeasor Release, which provides, *inter alia*, that the Settlement Agreement is not intended to release LOB. The parties disagree about how this Settlement Agreement affects LOB's liability.

Plaintiffs assert that the $240,000 that plaintiffs will receive as a result of the Settlement Agreement does not entitle LOB to any setoff of its liability. In support of their assertion, plaintiffs cite *Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447 (4th Cir.1990). In *Pinchback*, the plaintiff entered into a consent decree that released certain defendants from liability in exchange for $4,000. *Pinchback*, 907 F.2d at 1453. After a bench trial, the district court entered judgment against a nonsettling defendant in the amount of $2,500 for violations of 42 U.S.C. §§ 1981 and 1982. *Id.* The nonsettling defendant then argued that, based on a Maryland statute, the $2,500 judgment should be setoff by the $4,000 paid pursuant to the settlement agreement. *Id.* The Fourth Circuit, however, held that the settlement agreement did not reduce the judgment amount against the nonsettling defendant. *Id.* Thus, the plaintiff was entitled to recover $6,500, notwithstanding the fact that the judgment was only for $2,500.

In response, LOB asserts that it is entitled to a *pro tanto* reduction of the judgment amount. Under the *pro tanto* rule, the settlement amount is deducted from the entire amount of damages for which the nonsettling defendants are liable. *See In re Jiffy Lube Securities Litigation*, 927 F.2d 155, 160 n. 3 (4th Cir.1991) (discussing the *pro tanto*, *pro rata*, and proportional methods of setoff). Thus, in this case, LOB's liability would be reduced by the $240,000 paid by Rommel and Rommel Builders. In support of their assertion, LOB cites *In re Jiffy Lube Securities Litigation*, 772 F.Supp. 890 (D.Md.1991), in which the District of Maryland applied the *pro tanto* rule in a federal securities case. LOB also cites *Miller v. Apartments and Homes of New Jersey, Inc.*, 646 F.2d 101, 108–10 (3rd Cir.1981), in which the Third Circuit held that nonsettling defendants in civil rights cases were entitled to a *pro tanto* reduction based on the court's finding that contribution was available under federal common law.[17]

The Court finds that the Fourth Circuit's decision in *Pinchback* is controlling authority in this case. LOB, therefore, is not entitled to any setoff. This, however, permits the seemingly peculiar result of allowing the plaintiffs to recover more than the total amount of the judgment. Such a result directly contradicts the "almost universally held principle that there can only be one satisfaction for an injury or wrong." *Atlas Food and Serv. Inc. v. Crane Int. Vendors, Inc.*, 99 F.3d 587, 596 (4th Cir.1996) (internal quotations omitted) (citations omitted). This principle is embodied in the "one satisfaction rule," which is an equitable doctrine that "operates to reduce a plaintiff's recovery from the nonsettling defendant to prevent the plaintiff from recovering twice from the same assessment of liability." *Chisholm v. UHP Projects, Inc.*, 205 F.3d 731, 737 (4th Cir. 2000); *see also McDermott, Inc. v. AmClyde*, 511 U.S. 202, 208, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994) ("[i]t is generally agreed that when a plaintiff settles with one of several joint tortfeasors, the nonset-

---

**17.** The rationale supporting the Third Circuit's decision in *Miller* has been rendered suspect by *Northwest Airlines v. Transport Workers Union of America*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981), in which the Supreme Court held that there is no federal common law right to contribution under Title VII.

tling defendants are entitled to a credit for that settlement.").

Although many states have codified set-off rules, which incorporate the one satisfaction rule, there is no federal statute addressing a joint tortfeasor's right to a setoff. *See, e.g.,* Md.Code Ann., Courts and Judicial Proceedings, § 3.1404 (formerly art. 50, § 19) (1998). The Fourth Circuit, in *Pinchback,* appears to equate the lack of a federal statute with the lack of a right to setoff in federal civil rights cases.[18] Other courts, however, have permitted setoffs for nonsettling defendants in federal civil rights cases despite the lack of a federal statute.[19] Nonetheless, this Court is bound by *Pinchback.* Further, "[t]he law contains no rigid rule against overcompensation." *McDermott,* 511 U.S. at 219, 114 S.Ct. 1461. Accordingly, LOB is liable for the full amount of the judgment notwithstanding the fact that plaintiffs will also receive $240,000 from the settling defendants.

### V.

For all of the foregoing reasons, the Court will enter judgment in favor of plaintiff, Kevin Beverly, against defendant, LOB, Inc., in the amount of $1.00, and in favor of plaintiff, Baltimore Neighborhoods, Inc., against defendant LOB, Inc., in the amount of $3,358.27. The Court will also grant equitable relief to plaintiffs, Kevin Beverly and Baltimore Neighborhoods, Inc., and will enter an order for defendant, LOB, Inc., to pay into the registry of the Court a total amount of $333,145.28. Plaintiffs' claim under the Americans with Disabilities Act of 1990 is dismissed. Judgment will be entered in accordance with this Opinion.

---

**18.** *Pinchback,* 907 F.2d at 1453 ("there is no federal equivalent to § 19 which suggests that the $2,500 should be reduced") The Fourth Circuit has, however, permitted a setoff under federal admiralty law where proportionate fault could not be determined. *See Chisholm,* 205 F.3d 731, 737.

**19.** *See Dobson v. Camden,* 705 F.2d 759, 762 (5th Cir.1983) (adopting a rule of proportional setoff in § 1983 cases); *Miller,* 646 F.2d at 110 (permitting *pro tanto* setoff in federal civil rights); *Mason v. New York,* 949 F.Supp. 1068, 1077–78 (S.D.N.Y.1996) (permitting *pro tanto* setoff in § 1983 case); *Hoffman v. McNamara,* 688 F.Supp. 830, 834 (D.Conn. 1988) (same); *Goad v. Macon County Tennessee,* 730 F.Supp. 1425, 1431 (M.D.Tenn.1989) (same). These courts have held that 42 U.S.C. § 1988 requires the court to first see if federal law resolves the issue. *See e.g., Dobson,* 705 F.2d at 761–62. If it does not, state law is then applied, unless state law would be inconsistent with federal law, in which case the court will fashion a rule that is consistent with federal law. *Id.*